Bryan Hurlbutt (ISB # 8501)
Andrew Hursh (ISB # 12644)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
bhurlbutt@advocateswest.org
ahursh@advocateswest.org

Roger Flynn (Colo. Bar # 21078), *Pro Hac Vice Pending*
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF IDAHO**

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE and GOLDEN EAGLE AUDUBON SOCIETY,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. FOREST SERVICE,<br><br>Defendant. | Case No: 25-329<br><br>**COMPLAINT** |

## INTRODUCTION

1. Plaintiffs Idaho Conservation League and Golden Eagle Audubon Society file this case challenging Defendant U.S. Forest Service's actions approving the 2023 CuMo Exploration Project, a six-year mine exploration in the headwaters of Grimes Creek on federal public lands in the Boise National Forest. The Forest Service's approval of the Project violates the National Forest Management Act (NFMA), 16 U.S.C. § 1600 et seq.; the National Environmental Policy Act

(NEPA), 42 U.S.C. §§ 4321 *et. seq.*; the Forest Service Organic Administration Act (Organic Act), 16 U.S.C. §§ 475, 478, 551; the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706; and regulations and policies under these statutes.

2. Twice in the past the Forest Service approved a similar project at the same location (the 2007 CuMo Exploration Project), and both times, this Court found the approval unlawful. In 2012, this Court remanded the first approval, holding that the Forest Service violated NEPA by failing to gather baseline groundwater hydrology information needed to take the requisite "hard look" at the potential effects of drilling hundreds of deep exploration holes. *Idaho Conservation League, et al. v. Forest Service*, Case No. 1:11–cv–00341–EJL, 2012 WL 3758161 (D. Idaho Aug. 29, 2012). In 2016, this Court remanded the second approval, holding that the Forest Service violated NFMA and NEPA by failing to gather up-to-date baseline information on the presence of the rare plant Sacajawea's bitterroot. *Idaho Conservation League, et al. v. U.S. Forest Service*, Case No. 1:16-cv-0025-EJL, 2016 WL 3814021 (D. Idaho July 11, 2016).

3. Now, in approving the 2023 Project, the Forest Service again violated NEPA and NFMA by failing to gather up-to-date baseline information on Sacajawea's bitterroot and failing to properly account for the Project's adverse effects to this rare plant, which is found only in Idaho, with its largest known populations occurring at the Project site. The agency also violated NFMA by authorizing the construction of new roads in protected Riparian Conservation Areas (RCAs) without first ensuring there was no alternative in contravention of the governing Forest Plan.

4. For these and the related reasons addressed herein, Plaintiffs ask the Court to declare that the Forest Service's Decision Notice and Finding of No Significant Impact (DN/FONSI), Environmental Assessment (EA), and related Project approvals and decisions violate federal law. Plaintiffs also ask the Court to vacate the Forest Service's unlawful actions.

## JURISDICTION

5. This is a suit pursuant to the APA, NFMA, NEPA, Organic Act, and other federal statutes, regulations, and requirements. Jurisdiction over this action is conferred by 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief).

6. An actual, justiciable controversy now exists between Plaintiffs and Defendants. The challenged actions are final and subject to judicial review under 5 U.S.C. §§ 702, 704, and 706. The requested relief is therefore proper under 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 2201–2202.

7. Venue is proper in the District of Idaho pursuant to 28 U.S.C. §§ 1391(b). The public lands and resources in question are located within Boise County, Idaho. The Forest Service's Boise National Forest produced the EA and issued the DN/FONSI and is responsible for the Project's compliance with applicable laws and regulations.

8. Plaintiffs are located and reside in Idaho.

9. The federal government has waived sovereign immunity under the APA, 5 U.S.C. §§ 701–706.

## PARTIES

10. Plaintiff IDAHO CONSERVATION LEAGUE is an Idaho non-profit organization dedicated to preserving Idaho's clean water, wilderness, and quality of life through citizen action, public education, and advocacy. Founded in 1973, the mission of the Idaho Conservation League is to create a conservation community and pragmatic, enduring solutions that protect and restore air, water, and land and wildlife. Idaho Conservation League's seven strategic initiatives include confronting climate change, recovering Idaho's wild salmon and steelhead, cleaning up the Snake River, protecting public land, restoring the abundance and

diversity of Idaho's wildlife, safeguarding Idaho's lakes and waters, and reducing pollution. Idaho Conservation League achieves these goals through public outreach and professional advocacy. With offices in Boise, McCall, Ketchum, and Sandpoint, the organization is a consistent, statewide voice for conservation in Idaho and represents more than 8,000 members. Idaho Conservation League's members and supporters care deeply about protecting and restoring the environment.

11. Plaintiff GOLDEN EAGLE AUDUBON SOCIETY is based in Boise, Idaho, and is Southwest Idaho's chapter of the National Audubon Society. Golden Eagle Audubon Society's mission is to build an understanding, appreciation, and respect for the natural world in order to conserve and restore natural ecosystems for birds and other wildlife. Golden Eagle Audubon Society represents more than 800 members.

12. Plaintiffs bring this action on their own behalf, and on behalf of their members.

13. Plaintiffs participated in the Forest Service's public review and objection processes, timely submitting detailed comments and formal objections to the agency at every opportunity, thereby exhausting all administrative remedies.

14. Members of the Plaintiff organizations utilize the Boise River watershed and Boise National Forest, including the Grimes Creek watershed where the Project is proposed, for recreational activities including camping, biking, wildlife observation, scenery appreciation, birding, hunting, fishing, botanizing, swimming, backcountry skiing, hiking, firewood cutting, berry and mushroom picking, and biking. Plaintiffs' members derive health, recreational, inspirational, religious, spiritual, educational, and aesthetic benefits from these activities.

15. Plaintiffs' members regular use and enjoyment of the Grimes Creek watershed and surrounding public lands is significantly enhanced by opportunities to observe imperiled

species such as Sacajawea's bitterroot, wolverine, bull trout, and "sensitive" avian and terrestrial wildlife species and by the knowledge that they remain in this watershed. Plaintiffs' members derive recreational, religious, spiritual, educational, and aesthetic benefits from using and enjoying the lands and waters of the Grimes Creek watershed where these species are present and/or have suitable habitat.

16. As they have done for years, members of Plaintiffs intend to continue these uses and activities in the Grimes Creek watershed and in the Boise National Forest this year, and in future years. Plaintiffs' members have concrete and specific plans to use and enjoy the lands and waters in the Grimes Creek watershed and the Boise National Forest within the coming year.

17. One example of Plaintiffs' members who regularly uses and enjoys the Grimes Creek watershed and other lands that would be affected by the Project is John Robison, who is a member and employee (Public Lands and Wildlife Director) of the Idaho Conservation League. Mr. Robison has visited the Project site and surveyed the Project site from nearby National Forest land on seven occasions by vehicle and on foot since he first learned of the 2007 Project, including his most recent visit on May 5, 2025. He has also gone on numerous airplane flyovers of the Project site over the last 17 years, including most recently in 2024. On some visits, he has hiked, fished in Grimes Creek, looked for and observed birds, fish, wildlife, and plants, and observed and investigated past mining activities and their impacts in and near the Project site.

18. Mr. Robison also recreates on the Boise National Forest not far from the Project site, including backcountry snowboarding on Pilot Peak and Freeman Peak, which are approximately 9 and 7 miles from the Project site. He enjoys looking for animal tracks on these trips. Mr. Robison regularly canoes and kayaks in the Boise River downstream of the Project site. He also fishes in the Boise River, typically once a week from July through October.

19. Mr. Robison has looked for Sacajawea's bitterroot at the Project site. He has also looked for and observed Sacajawea's bitterroot at other locations in the Boise National Forest. On multiple occasions he has hiked the Mores Mountain Nature Trail to look for, and in some instances observe, Sacajawea's bitterroot, and to enjoy expansive views of the Grimes Creek watershed, the Boise National Forest, and the Project site in the distance.

20. Mr. Robison plans to continue regularly visiting the Project site and areas affected by the Project this year and into the future, like he has in the past, including to go fishing and to look for Sacajawea's bitterroot.

21. Another example is Cynthia Wallesz, who is a member and employee (Executive Director) of Golden Eagle Audubon Society. Ms. Wallesz regularly uses lands that would be affected by the Project. She takes weekly visits to the Boise River watershed and yearly visits into the Boise National Forest. Ms. Wallesz visited the Project site on May 5, 2025. During her visits, she has hiked around looking for plants, birds, fish, insects, and wildlife, and skied when conditions allowed. As she has in the past, Ms. Wallesz plans to continue regularly visiting the Project site and surrounding affected areas this year and in the future for the same purposes.

22. These uses and activities of Plaintiffs' members, including Mr. Robison and Ms. Wallesz, will be immediately, irreparably, and adversely affected and, in many cases, eliminated, by the Project, as reviewed and approved by Defendant Forest Service. This includes significant harm to Plaintiffs' members' interests in the imperiled plant, fish, and wildlife species that depend on the Grimes Creek watershed and other lands affected by the Project, such as Sacajawea's bitterroot, wolverine, bull trout, and sensitive bird species.

23. Plaintiffs and their members have been and will continue to be adversely affected and irreparably harmed if Defendant Forest Service's ongoing violations of the federal laws

noted herein continue. These are actual, concrete injuries caused by the Forest Service's violations of federal law.

24. Defendants' failure to comply with NEPA, NFMA, and the Organic Act additionally harms Plaintiffs and their members by denying them the right to informed decision-making and full disclosure under these laws, as well as the right to meaningfully participate in the decision-making process.

25. Plaintiffs also suffer injury-in-fact because they have devoted time, attention, and money to protecting public lands, plants, fish, wildlife, and water quality from the Project. Plaintiff organizations have diverted resources from other efforts they would have pursued toward achieving their missions and have instead used those resources to conduct field visits, submit public comments and objections to the Forest Service, and engage with officials about their concerns with the Project.

26. Plaintiffs' and their members' injuries will be redressed by the relief sought. If the challenged decisions are vacated, as requested, the CuMo Exploration Project will no longer be able to proceed and its adverse environmental impacts will not occur. If the Project is declared unlawful and remanded, on remand the Forest Service can adequately include Plaintiffs and the public in the decision-making process, and the agency can make an informed, reasoned, legally compliant decision that better protects the environment.

27. DEFENDANT U.S. FOREST SERVICE is a federal executive agency responsible for, among other things, managing federally-owned lands, wildlife, and public natural resources in the lands affected by the Project in the Boise National Forest. The Forest Service has the ultimate responsibility to administer, implement, and comply with the Organic

Act, NEPA, and NFMA and all other applicable federal laws and regulations. Forest Service officials in Idaho issued the challenged decisions/actions.

## LEGAL BACKGROUND

**The Forest Service Organic Act of 1897**

28. The Organic Act requires the Forest Service "to regulate [the] occupancy and use [of national forests] and to preserve the forests thereon from destruction." 16 U.S.C. § 551. The Organic Act also requires that those persons "prospecting, locating, and developing the mineral resources [on a national forest] . . . must comply with the rules and regulations covering such national forests." 16 U.S.C. § 478.

29. The Forest Service's mining regulations require: "All [mining] operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources." 36 C.F.R. § 228.8. The regulations also require the Forest Service "to maintain and protect fisheries and wildlife habitat which may be affected by the operations." 36 C.F.R. § 228.8(e). The Forest Service can and must reject an unreasonable mine plan and prohibit mining activity until appropriate evaluation of the plan is completed and reasonable mitigation measures are in place to protect public resources.

**The National Environmental Policy Act**

30. NEPA, 42 U.S.C. §§ 4321–4370(h), requires federal agencies to take a "hard look" at the environmental consequences of their proposed actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). NEPA directs agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). Agencies

must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document." *Id.* § 4332(D). Agencies must also "make use of reliable data and resources," *id.* § 4332(E), and "initiate and utilize ecological information in the planning and development of resource-oriented projects," *id.* § 4332(k).

31. To take this "hard look," federal agencies must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An "EIS must be prepared if substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quotation omitted). The Ninth Circuit has regularly described the bar for whether significant effects may occur as a "low standard." *See*, *e.g.*, *League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011); *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

32. For actions "for which the need of an EIS has not been determined," Forest Service NEPA regulations provide that the agency can prepare an EA. 36 C.F.R. § 220.7(a). *See also* 42 U.S.C. § 4336(b)(2). An EA: "Shall briefly provide sufficient evidence and analysis, including the environmental impacts of the proposed action and alternative(s), to determine whether to prepare an EIS or a FONSI." 36 C.F.R. § 220.7(b)(3)(i). If an EA and FONSI have been prepared, a decision notice (DN) "must document the conclusions drawn and the decision(s) made based on the supporting record." *Id.* § 220.7(c).

33. The Forest Service NEPA regulations require that the Forest Service "discuss the direct, indirect, and cumulative impact(s) of the proposed action and any alternatives" in an EA. *Id.* § 220.7(b)(3)(iv). The regulations also require that the "final analysis documents an agency

assessment of the cumulative effects of the actions considered (including past, present, and reasonabl[y] foreseeable future actions) on the affected environment." *Id.* § 220.4(f).

34. NEPA also requires the agency to fully analyze the baseline conditions of the affected environment. The establishment of the baseline conditions is a fundamental requirement of the NEPA process, because an inadequate environmental baseline precludes an accurate assessment of an action's environmental impacts. *N. Plains Resource Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011). "Without accurate baseline data before the Project begins, it is impossible to know whether and to what extent the Project's activities will impact [Sacajawea's bitterroot] even with the proposed design features, monitoring, and mitigation features." *Idaho Conservation League*, 2016 WL 3814021 at *11.

**The National Forest Management Act & Boise Forest Plan**

35. NFMA requires the Forest Service to prepare a land and resource management plan (commonly called a "forest plan") for each national forest including standards and guidelines for managing the forest. *See* 16 U.S.C. §§ 1604. Among other requirements, NFMA imposes the duty that the Forest Service "provide for diversity of plant and animal communities" in its forest plans. 16 U.S.C. § 1604(g)(3)(B). NFMA and its implementing regulations also require that all management actions approved by the Forest Service must be consistent with the governing forest plan. 16 U.S.C. § 1604(i); *see* 36 C.F.R. Part 219.

36. The Forest Service adopted a forest plan for the Boise National Forest (hereinafter the "Forest Plan"), which contains goals, objectives, guidelines, and standards for managing mining and mine explorations and for protecting plants, water quality, fish, and wildlife in the Boise National Forest, and which apply to the 2023 CuMo Exploration Project. The Forest Plan defines a "standard" as "a binding limitation placed on management actions," and states that a

project that varies from a standard "may not be authorized unless the Forest Plan is amended to modify, remove, or waive application of the standard." The Forest Plan defines a "guideline" as a "preferred or advisable course of action generally expected to be carried out," and while deviation from a guideline does not require a forest plan amendment, "rationale for deviation must be documented in the project decision document."

37. To protect sensitive plants, including Sacajawea's bitterroot, the Forest Plan includes botany guideline "BTGU01" which requires of the Forest Service when reviewing any project that "suitable habitat should be determined for Sensitive species within or near the project area" and directs the Forest Service to "[c]onduct surveys for those species with suitable habitat to determine presence." Forest Plan standard "BTST01" requires: "Management actions that occur within occupied sensitive plant species habitat must incorporate measures to ensure habitat is maintained where it is in desired conditions, or restored where degraded."

38. To protect streams and fish habitat from sediment and temperature increases and other pollution and alterations, the Forest Plan designates and protects Riparian Conservation Areas ("RCAs"). For perennial stream reaches, RCAs extend to 300 feet on either side of the stream. For intermittent streams, RCAs extend to 150 feet on either side. Forest Plan mining standard MIST04 requires the Forest Service to "[m]itigate degrading effects from locatable mining operations situated within RCAs by identifying reasonable locations for access, processing, and disposal facilities outside of RCAs, where possible." Standard MIST08 requires:

> Locate new structures, support facilities, and roads outside RCAs. Where no alternative to siting facilities in RCAs exists, locate and construct the facilities in ways that avoid or minimize degrading effects to RCAs and streams, and adverse effects to TEPC species. Where no alternative to road construction in RCAs exists, keep roads to the minimum necessary for the approved mineral activity. Close, obliterate, and revegetate such roads if no longer required for mineral or other management activities.

MIST09 similarly "[p]rohibit[s] solid and sanitary waste facilities in RCAs" unless "no alternative" exists, in which case enumerated minimization, monitoring, and reclamation measures must be taken.

39. Pursuant to NFMA, the Forest Service also designates "sensitive species," which it manages to: (1) ensure Forest Service actions do not contribute to loss of viability; (2) ensure activities do not cause the status of any species to move toward federal ESA listing; and (3) incorporates concerns for sensitive species throughout the planning process, reducing negative effects to species, and enhancing opportunities for mitigation. Forest Service Manual, 2670. The Forest Plan defines "sensitive species" as follows:

> A Forest Service or BLM designation, sensitive plant and animal species are selected by the Regional Forester or the BLM State Director because population viability may be a concern, as evidenced by a current or predicted downward trend in population numbers or density, or a current or predicted downward trend in habitat capability that would reduce a species' existing distribution.

The Forest Plan defines "viable population" as a "population that is regarded as having the estimated numbers and distribution of reproductive individuals to ensure that it will continue to exist over time and will be well distributed within a given area." Designated sensitive species on the Boise National Forest include Sacajawea's bitterroot.

**The Administrative Procedure Act**

40. The APA empowers federal courts to hold unlawful and set aside any final agency action which is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted).

## FACTUAL BACKGROUND

**The 2023 CuMo Exploration Project.**

41. The 2023 CuMo Exploration Project is a 6-year mineral exploration project in the Boise National Forest, including 4 years of exploratory drilling and 2 years of reclamation. The Project proponent, Idaho Copper Corporation, seeks to delineate copper and molybdenum mineral deposits to enable subsequent modeling of the subsurface geology and associated structure and mineralization.

42. The Project site is in Boise County, Idaho, approximately five miles northeast of Pioneerville and 14 miles north of Idaho City. The Project area comprises 2,917 acres, of which 2,617 acres are National Forest lands. The site is mountainous and forested and includes many streams. The Project site is in the headwaters of Grimes Creek, a tributary of Mores Creek, which is a tributary to the Boise River at Lucky Peak Reservoir. The Boise River flows through Idaho's Treasure Valley and is a source of drinking and agriculture water for this most populous part of the state.

43. Numerous at-risk species have habitat at the Project site. Sacajawea's bitterroot, a Forest Service-designated "sensitive species," grows at the site, which is home to the largest known populations in the world of this very rare plant. Sensitive species of avian wildlife, including flammulated owl and northern goshawk, have been documented in the Project area. Columbia Spotted frog, another sensitive species, have been recorded along Grimes Creek in the Project area. The headwaters of Grimes Creek, including at the Project site, support what may be the only remaining population of bull trout in the Mores Creek watershed. Bull trout are listed as "threatened" under the federal Endangered Species Act.

44. Under the Project as approved, Idaho Copper would construct up to 8.9 miles of new "temporary" mining roads through the site, including up to five new stream crossings, and use 5.5 miles of existing "temporary" mining roads, with 4 existing stream crossings. Idaho Copper would construct up to 122 drill sites and drill up to 250 holes. Overall, up to 72.3 acres of National Forest lands could be cleared to construct road and drill pads and other infrastructure.

45. Each year, Project activities could occur seasonally from April 15 to December 15. Up to four drill rigs could run 24 hours per day, every day during drilling operations.

46. Because the Project's drilling program is "results-driven," meaning as the Project proceeds drill hole locations will be selected based on the results of prior drilling, the Forest Service asserted that "predicting the exact sequence of remaining events, road locations/alignments, and when any hole might be drilled or at what orientation is difficult." EA, p. 12. The Forest Service said the "EA evaluates the potential environmental effects of the full possible range of proposed activities under the 2023 CuMo Plan." *Id.* The Forest Service added: "By considering the maximum extent of disturbance—including the construction of new temporary roads, stream crossings, drill sites, and other infrastructures—the determinations remain valid regardless of specific sequences or locations within the project area." *Id.*

47. According to the Forest Service's EA, Idaho Copper Corporation "will submit detailed operating plans to the Forest Service for review and approval before implementation (i.e., annual operating plan). These operating plans will be developed to meet the requirements of the approved Plan, including any mitigation measures and monitoring requirements . . .". *Id.*

48. The 2023 CuMo Exploration Project is similar to and shares the same site as the 2007 CuMo Exploration Project, which was twice approved by the Forest Service but only partially carried out.

**Approvals & Remands of the 2007 CuMo Exploration Project.**

49. This Court twice declared unlawful and remanded the Forest Service's approval of the 2007 Project.

50. Mining company Mosquito Gold submitted a Plan of Operations to the Forest Service seeking approval of the 2007 CuMo Exploration Project. The 2007 Project was first approved in February, 2011, when the Forest Service issued a DN/FONSI, based on an EA. The 2007 Project included constructing 10.2 miles of road, constructing 137 drill sites, and drilling up to 259 explorations holes over five years.

51. Plaintiffs filed suit, and in 2012, this Court remanded the DN/FONSI and EA after ruling against Plaintiffs on some claims and ruling in Plaintiffs' favor on the claim that the Forest Service violated NEPA when it failed to take a hard look at the risks exploration drilling posed to groundwater. *See Idaho Conservation League, et al. v. Forest Service*, 2012 WL 3758161 (D. Idaho Aug. 29, 2012). Specifically, the court rejected the Forest Service's arguments that there would be no impact because drilling fluids would be non-toxic and biodegradable and because drill holes will be filled and sealed and will follow Idaho mining BMPs. *Id.* at *15. "Boring down to 3,000 feet over 200 times into the subsurface of the area undoubtedly warrants some analysis and consideration of the impact of the drilling itself; irrespective of the concerns solved by using closed drilling." *Id.* The Court added:

> The appropriate course would be for the Forest Service to have conducted some baseline study and analysis of the groundwater in the area in order to reach the finding of no significant impact. The Forest Service's assurances that the closed system alleviates any concerns over impact to the groundwater may be enough as to the contamination concern if there were some baseline established and a system for monitoring. In this case, however, there is no monitoring mechanism in place for groundwater nor any mitigation measures in place to respond to possible impacts as have been put in place for other environmental considerations such as impacts to sensitive species.

*Id.* at *16. The Court vacated and remanded the EA to the Forest Service for further proceedings consistent with its opinion. *Id.* at *22.

52. During the litigation and before the 2012 remand, mineral exploration commenced as Mosquito Gold constructed 1.8 miles of temporary road, constructed six drill sites, and drilled nine exploration holes.

53. In 2015, the Forest Service issued a Supplemental EA and a new DN/FONSI, approving the 2007 Project again, this time with some additional baseline groundwater hydrology analysis and water quality mitigation measures. In 2015, after the Forest Service completed the plant surveys it used for the Supplemental EA, but before it approved the Project, the Grimes Fire burned 923 acres of the Project site, and a firefighting line was bulldozed through the largest populations of Sacajawea's bitterroot at the site. But the Forest Service never resurveyed for Sacajawea's bitterroot after the fire and before it approved the Project.

54. Plaintiffs filed suit, and this Court remanded and vacated the Supplemental EA and DN/FONSI. *See Idaho Conservation League, et al. v. U.S. Forest Service*, 2016 WL 3814021 (D. Idaho July 11, 2016). "[T]he Court finds the Forest Service failed to re-evaluate the baseline data for [Sacajawea's bitterroot] following the Grimes Fire prior to approving the Project. Without an accurate baseline, the Project's monitoring and mitigation measures will not be effective or accurate." *Id.* at 17. The Court found a NEPA violation because "the Forest Service's analysis . . . failed to take a 'hard look' at the Project's impacts on the environment with regard to a known rare and at risk plant." *Id.* at *16. The Court also found a NFMA violation because: "Failing to obtain the necessary baseline is contrary to Guideline BTGU01 [in the Forest Plan] because the Forest Service did not determine the existing suitable habitat for and presence of LESA within or near the project area." *Id.* at 17.

55. In 2016, another fire (the Pioneer Fire) burned 1,578 acres of the Project area.

56. After the 2016 remand, the Forest Service began work on a second Supplemental EA for the 2007 Project, which went out for public comment in 2018. The Supplemental EA utilized Sacajawea's bitterroot surveys conducted in 2017 in portions of Project site. This environmental analysis was never completed, and the 2007 Project was never approved again or completed.

**Defendants' Approval of the 2023 CuMo Exploration Project.**

57. Idaho Copper assumed control of the CuMo mining claims in 2023 and submitted a Plan of Operations to the Forest Service in September 2023, requesting approval of the 2023 CuMo Exploration Project.

58. On October 10, 2023, the Forest Service sent a scoping letter describing the Project and soliciting comment. The Forest Service received comments from 695 parties. Plaintiffs submitted comments, urging the Forest Service to prepare an EIS, conduct new and comprehensive surveys for Sacajawea's bitterroot, prohibit unnecessary RCA incursions, and protect Sacajawea's bitterroot.

59. On May 29, 2024, the Forest Service announced a 30-day public comment period on a Draft EA. The Forest Service received 1,237 responses. Plaintiffs submitted comments, raising concerns that the Forest Service failed to conduct comprehensive and up-to-date surveys for Sacajawea's bitterroot and failed to protect Sacajawea's bitterroot and RCAs. Plaintiffs urged the Forest Service to prepare an EIS.

60. In September 2024, the Forest Service issued the Final EA and a Draft DN/FONSI. Plaintiffs submitted timely objections, again warning the Forest Service that it lacked comprehensive and up-to-date information about Sacajawea's bitterroot; failed to protect

RCAs and Sacajawea's bitterroot; failed to comply with forest plan provisions; and was required to prepare an EIS.

61. On March 13, 2025, the Deputy Regional Forester issued a written response to objections, denying Plaintiffs' objections. However, the Deputy Regional Forester expressly instructed the Forest Service that, before a decision notice can be signed, the agency must: "Provide rationale in the Decision Notice why reliance on 2017 survey data is appropriate for Sacajawea's bitterroot"; and "Provide rationale in the Decision Notice how the project complies with Forest Plan Standards, specifically MIST04, MIST08, and MIST09."

62. One day later, on March 14, 2025, Forest Supervisor Brant Petersen signed the DN/FONSI, approving the 2023 CuMo Exploration Project based on the EA and without preparing an EIS. In response to the Deputy Regional Forester's instructions, Mr. Petersen added three sentences to the DN/FONSI.

63. Compared to the Draft DN/FONSI, with respect to Sacajawea's bitterroot, the Final DN/FONSI added a single sentence regarding the agency's conclusion that the Project may impact individual plants but is not likely to cause a trend to federal listing or loss of viability. The additional sentence read as follows: "For Sacajawea's bitterroot, baseline surveys collected in 2017 and supplemented by botanical clearance surveys in 2021 and 2022 represent the most recent dataset available and is appropriate when considering the life history of the species and lack of substantial change from stochastic events or project work in the time since the surveys (EA Section 3.2 and Botanical Resources and Non-native Plants Resource Report)." DN/FONSI, p. 12. No other information or explanation was added regarding Sacajawea's bitterroot.

64. Compared to the Draft DN/FONSI, with respect to MIST04, MIST08, and MIST09, the Final DN/FONSI added two sentences to the section asserting that the Project

complies with the Forest Plan. The two additional sentences read as follows: "This includes MIST04, MIST08, and MIST09. The EA identifies several measures to protect RCAs, such as WR-9 found in Appendix B, which limits, to a reasonable extent, the amount of activity that may take place in an RCA." *Id.* at 10. No other information regarding RCAs was added.

65. In the DN/FONSI, the Forest Service described the Project's "context" as "limited" in its size and activities, without mentioning that the site is home to the world's largest-known populations of the rare Sacajawea's bitterroot or that it is upstream of Idaho's largest population. The DN/FONSI concluded that the Project "will not significantly affect the quality of the human environment, considering the context and intensity of impacts" and "[t]hus, an environmental impact statement will not be prepared." *Id.* at 8.

66. According to the DN/FONSI, approval of the 2023 CuMo Plan is contingent upon the proponent's acceptance of mitigation measures developed to minimize the operation's effects on surface resources and the posting of financial assurance to ensure reclamation for project-related disturbance. Written approval for implementation of the Project can only be obtained once three criteria have been met: (1) submittal of the revised Plan with incorporation of the mitigation measures required in the DN; (2) submittal of an acceptable financial assurance bond in accordance with 36 CFR 228.13; and (3) proof or waiver of CWA section 401 certification.

**RCA Incursions Authorized for the 2023 CuMo Exploration Project**

67. "Riparian zones are among the biosphere's most complex ecological systems and also among the most important for maintaining the vitality of the landscape and its rivers." Forest Plan at B - 32 (citation omitted). RCAs include riparian corridors, wetlands, intermittent and perennial streams, and other areas that help maintain the integrity of aquatic ecosystems by (1) influencing the delivery of coarse sediment, organic matter, and woody debris to streams, (2)

providing root strength for channel stability, (3) shading the stream, and (4) protecting water quality.

68. In the Forest Plan, the Forest Service emphasizes the importance of small streams, like many of those at the Project site:

> Small streams are more affected by hillslope activities than are larger streams . . .; smaller channels respond more quickly to changes in hydrologic and sediment regimes; and streamside vegetation is a more dominant factor in terms of woody debris inputs and leaf litter and shading. Small perennial and intermittent non-fish-bearing streams are especially important in routing water, sediment, and nutrients to downstream fish habitats.

Forest Plan at B - 40.

69. "Aquatic and riparian systems are easily affected by land management activities on surrounding hillslopes." *Id.* at B - 32.

70. In response to public comments raising concerns about the adverse impacts of exploration activities in RCAs and about Forest Plan requirements to protect RCAs, the Forest Service prohibited locating any drill pads in RCAs. But the Forest Service did not do the same with roads and their supporting facilities. Rather, the Forest Service authorized the construction of up to five stream crossings and associated roads in RCAs. And while the Project is "results driven" and thus might change as it proceeds, Idaho Copper's proposal shows numerous roads it plans to construct crossing through and traveling within RCAs, as shown in Figure 1 below.

71. Figure 1 depicts multiple stream crossings and stretches of road Idaho Copper plans to build in RCAs in the headwaters of Charlotte Gulch. Figure 1 also depicts at least one crossing (if not more) and multiple road incursions Idaho Copper plans to construct in RCAs along Pinch Creek, including road segments through mapped wetlands. Where other streams in the Project boundary are seasonal or intermittent, Charlotte Gulch and Pinch Creek are two perennial (continuously flowing) streams at the Project site.

**Fig. 1.** "Map 8. Surface water resources" from EA Appendix 6.3




72. For the RCA incursions depicted on in Figure 1, including the five stream crossings the Forest Service authorized, the agency never considered whether there was "no alternative," as required by MIST08. Notably, the EA does not even mention MIST08, nor do any of the many specialist reports prepared for the project, including the various fisheries and water-related specialist reports, even though those reports discuss dozens of other Forest Plan provisions. The Draft DN/FONSI did not mention MIST08 either. The Final DN/FONSI was amended to mention MIST08, in response to the objection reviewer officer's direction that the Forest Service must explain how the Project complies with this provision. However, all the

DN/FONSI provides is a conclusory statement that the Project complies with MIST08 without any explanation or documentation.

73. The 2007 Project had a pre-disturbance checklist process which required that as the results-driven project unfolded, if the mining company wanted to build a road in an RCA, it had to submit a proposal in advance to the Forest Service showing, among other things, that there were no practicable alternatives to locating the proposed road in an RCA. *See Idaho Conservation League*, 2012 WL 3758161 at *22 ("The Forest Service properly evaluated the Forest Plan as required by NFMA and set forth a plan for approving any encroachments into an RCA that is unavoidable. . . ."). Under the checklist process, the mining company could not build the road unless and until the Forest Service found there was no alternative and approved it.

74. But the 2023 CuMo Exploration Project does not have the same pre-disturbance checklist process. While the 2023 Project has an annual plan process where Idaho Copper must notify the Forest Service of the location of the roads it plans to build each year, unlike the old checklist process, Idaho Copper is not required to identify which roads are in RCAs and is not required explain why there is no alternative to locating such roads in RCAs. And there is no step requiring the Forest Service to approve those RCA incursions. For the 2023 Project, as long as Idaho Copper limits itself to five new stream crossings, it can construct those stream crossings and any associated roads in RCAs whether or not there is an alternative to doing so.

**Adverse Impacts to Sacajawea's Bitterroot.**

75. Sacajawea's bitterroot (*Lewisia sacajaweana* or "LESA") is very rare and endemic to central Idaho. It is a Forest Service-designated "sensitive species."

76. The world's largest known populations of the plant are found at the Project site, including in areas targeted by Idaho Copper for road and drill pad construction and drilling

operations. The Forest Service estimates that there are 13,735 Sacajawea's bitterroot plants at the Project site and that these represent around 1/3 to 1/2 of all known occurrences of the species.

77. The Forest Service prepared a Botanical Resources and Non-native Plants Biological Evaluation and Technical Report (the "Botanical Resources Report") for the Project, which addressed Sacajawea's bitterroot.

78. The Botanical Resources Report explains that little is known and understood about this rare species but that what is known suggests it faces a very perilous situation. "[A]t the species level, Sacajawea's bitterroot would be considered at risk of not withstanding or recovering from stochastic events." Botanical Resources Report, p. 53. "Little is known about Sacajawea's bitterroot reproductive biology and recruitment success," the Report states. *Id.* "The species exhibits a low level of representation through low genetic diversity and may be unable to adapt as quickly to changing environments," and "[a]s a species, Sacajawea's bitterroot has a low level of redundancy, given the number of occurrences and lack of connectivity." *Id.* at 54.

79. The Botanical Resources Report notes that "[r]esearch has yet to determine a threshold of the number of individuals the occurrence [at the Project site] may withstand before eroding its ability to recover." *Id.* This limitation stems in part from the fact that the Forest Service has not conducted adequate surveys to understand this rare, at-risk species.

80. For example, after the 2016 court decision, post-fire surveys were conducted for Sacajawea's bitterroot at the Project site in 2017. But these surveys occurred in some, but not all, areas of suitable Sacajawea's bitterroot habitat at the Projects site. And while limited additional surveys occurred in 2021 and 2022, they covered only a very small fraction of the Project site, did not verify the status of Sacajawea's bitterroot in any of the previously surveyed areas from 2017, and did not survey other never-before-surveyed areas of suitable habitat at the Project site.

The Botanical Resources Report acknowledged that the data from recent surveys "focused on select locations and were not comprehensive surveys of the entire population." Botanical Resources Report, p. 6. Thus, "[t]he 2017 baseline data sets are the most recent and complete population datasets available that reflect existing conditions." *Id.*

81. Despite the fact that the majority of areas known to be occupied by Sacajawea's bitterroot at the Project site have not been surveyed since 2017, and other areas of suitable habitat at the site have never been surveyed for plant occurrences, the Forest Service chose not to conduct any new Sacajawea's bitterroot surveys prior to approving the Project in 2025.

82. By approving the Project while lacking adequate baseline data on the status of Sacajawea's bitterroot, the Forest Service could not adequately address negative effects to the species. For example, the effects from the Grimes and Pioneer fires, dozer line construction, and other firefighting activities may extend over multiple years and could not have been captured in 2017 data alone. Such long-term effects include the opening-up and drying of areas previously occupied by plants, otherwise altering soil and hydrologic conditions plants depend on, and fostering the spread of weeds and other competing plants. The effects these types of changes have on Sacajawea's bitterroot could have materialized or worsened since 2017. At the same time, climate change, weed infestations, disease, disturbance from off-highway vehicles, disruption or loss of pollinators, and other impacts have continued to affect the landscape since 2017. The Forest Service ignored these factors in the EA and DN/FONSI when it asserted that the 2017 surveys were sufficient.

83. Figure 2 below shows the extensive network of new and existing roads Idaho Copper plans to construct, use, and maintain in areas known to be occupied by Sacajawea's bitterroot (red "Buffer Zone 1" areas) and in areas of "potential" habitat (green areas).

**Fig. 2.** "Map 3. Sacajawea's bitterroot" from EA Appendix 6.3



84. The Botanical Resources Report acknowledges that the Project's direct adverse impacts to Sacajawea's bitterroot from road and drill pad construction, maintenance, and reclamation are "high in probability and high in intensity," and it estimates that without mitigation measures, the Project "may impact up to 1,059 individual or 7.7 percent of the population and up to 10 acres or 2.5 percent of modeled potential habitat that has yet to be surveyed." *Id.* at 42. The Forest Service asserts, however, that mitigation measures for the Project will reduce this risk from "high" to "moderate." But this conclusion, and the conclusion that a "moderate" risk is acceptable at this singularly important site for an exceedingly rare species, is not backed up by any supporting evidence or meaningful analysis.

85. Moreover, by focusing on effects from different aspects of the Project in isolation, the Forest Service failed to consider the overall risk to Sacajawea's bitterroot. For example, the Botanical Resources Report found the "risk of exposure to non-native plant species infesting new areas and leading to a decrease in vegetation community integrity and resilience is high." *Id.* at 21. But it never considered these affects together with other effects, such as the direct impacts from road and drill pad construction.

86. And the Report admits there will be numerous cumulative adverse effects to Sacajawea's bitterroot from "dispersed recreation, snowmobile grooming, noxious weeds treatments, Forest Products gathering, grazing, fire suppression, commercial timber harvests, vegetation management activities, and prescribed fire on NFS lands; minerals exploration; implementation of the 2007 CuMo Plan reclamation actions; and climate change." *Id.* at 54. Further, the Report admits climate change can affect Sacajawea's bitterroot by causing "declining snowpacks, greater evaporative demand from the atmosphere, and shorter effective growing seasons" and that "given the species' autecology and the lower elevation range of the

population in the project area compared to other species occurrences, the population may be vulnerable to stressors resulting from climate change." *Id.* at 59.

87. Despite acknowledging these serious effects, the Forest Service failed to consider any quantitative or detailed information on these cumulative impacts, and failed to consider the combined toll that all direct, indirect, and cumulative effects may have on Sacajawea's bitterroot. The Botanical Resources Report concludes its section on species-level effects with only a vague and unsubstantiated estimate that, if all mitigation measures are successfully implemented, the number of individual plants that would be directly destroyed by a subset of Project disturbances would be less than 1 percent of those documented in surveys so far.

88. The Report also did not include any assessment of whether areas of suitable Sacajawea's bitterroot habitat at the Project site met desired conditions or were degraded, or any assessment of how management measures would maintain or restore desired conditions, even though Forest Plan standard BTST01 requires doing those things.

89. The Botanical Resources Report surmised that mitigation measures could work to reduce the harmful effects of the project on Sacajawea's bitterroot, and concluded that compared to the Project without mitigation measures, the Project with mitigation measures could "*improve the possibility of* long-term recovery of the occurrence and *reduce the loss* of redundancy, resiliency, and representation at the species level." *Id.* at 54 (Emphases added). Notably, the Report did *not* conclude that long-term recovery Sacajawea's bitterroot at the Project site was likely after the Project; rather, it merely concluded that with mitigation measures the possibility that plants might recover is better than it would be if the Project proceeded without mitigation. Overall, the Report admitted that the Project *will* contribute to the loss of redundancy, resiliency, and representation at the species level for this very rare plant.

**FIRST CLAIM FOR RELIEF**

*NFMA & APA Violations for Failing to Comply with Forest Plan.*

90. Plaintiffs hereby incorporate by reference all preceding paragraphs.

91. This first claim challenges the Forest Service's violations of the National Forest Management Act, 16 U.S.C. §§ 1601 *et seq.*, and NFMA's implementing regulations, by failing to comply with NFMA regulations and the Forest Plan for the Boise National Forest when it authorized the CuMo Exploration Project based on the EA and DN/FONSI. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

92. NFMA and its implementing regulations require that all management actions approved by the Forest Service must be consistent with the governing forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. Part 219. The Forest Service's approval of the 2023 CuMo Exploration Project is inconsistent with the Forest Plan and thus in violation of NFMA.

93. First, the Forest Service failed to comply with Forest Plan standard MIST08. MIST08 requires the Forest Service to locate roads outside of RCAs, unless there is no alternative. The Forest Service has authorized up to five stream crossings and related roads in RCAs, and may authorize other roads in RCAs already proposed by Idaho Copper, without having already determined (and without later requiring Idaho Copper to demonstrate) that there is no alternative. Additionally, the Forest Service has failed to ensure such RCA incursions are located and constructed to minimize degrading effects to RCAs and streams and adverse effects to at-risk species and failed to keep roads to the minimum necessary, as MISTO8 requires.

94. Second, the Forest Service failed to follow Botany Guideline BTGU01, which requires that "suitable habitat should be determined for sensitive species within or near the project area" and directs the Forest Service to "[c]onduct surveys for those species with suitable habitat to determine presence." When Idaho Copper submitted its Plan of Operations for the

2023 CuMo Exploration Project, the Forest Service failed to determine suitable habitat and conduct surveys for Sacajawea's bitterroot, and instead relied on outdated and incomplete information from the prior Project. Sacajawea's bitterroot surveys have never been conducted in parts of the Project site identified as suitable habitat. And where surveys have been conducted, almost all such areas were surveyed in 2017. In the DN, the Forest Service never acknowledged that was deviating from BTGU01 and never explained why it was deviating from this guideline.

95. Third, the Forest Service failed to follow Forest Plan standard BTST01, which requires: "Management actions that occur within occupied sensitive plant species habitat must incorporate measures to ensure habitat is maintained where it is in desired conditions, or restored where degraded." The Forest Service never identified which areas of occupied Sacajawea's bitterroot habitat at and around the Project site meet desired conditions versus which are degraded, including in areas where the Grimes and Pioneer fires burned, fire-fighting activities occurred, and mineral exploration drilling and road work occurred. The Forest Service also failed to incorporate measures to maintain or restore those habitats, and is instead authorizing road and drill pad construction and other exploration activities which will further degrade habitat.

96. Fourth, the Forest Service's finding that the Project will not lead toward a loss of Sacajawea's bitterroot viability was not reasonable or reasonably explained.

97. The Forest Service's approval of the Project is thus arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. § 706(2).

98. WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF

*NEPA & APA Violations for Arbitrary & Capricious EA*

99. Plaintiffs hereby incorporate by reference all preceding paragraphs.

100. This second claim challenges the Forest Service's violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations, by authorizing the CuMo Exploration Project based on the defective EA without taking a "hard look" at potential impacts as required by NEPA and otherwise failing to comply with NEPA. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

101. The purpose of NEPA "is to obviate the need for speculation by insuring that available data is gathered and analyzed prior to implementation of the proposed action." *LaFlamme v. FERC*, 852 F.2d 389, 400 (9th Cir. 1988). In an EA, the Forest Service must take a "hard look" and disclose to the public that it "has adequately considered and elaborated the possible consequences of the proposed agency action." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022). The Forest Service must take a hard look at the direct and indirect environmental impacts of the proposed action, as well as the cumulative environmental impacts of the proposed action together with other ongoing and reasonably foreseeable future actions. *See* 36 C.F.R. § 220.7(b). Taking a hard look requires the Forest Service to utilize up-to-date and comprehensive baseline information about environmental conditions at the Project site. *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011). Taking a hard look also requires providing details on any mitigation measures and their effectiveness. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380–81 (9th Cir. 1998). A legally adequate EA is a prerequisite to the Forest Service's compliance with its substantive duties to evaluate and protect public resources under the Organic Act and NFMA.

102. The EA is based upon unsupported assumptions, errors, and omissions which render them grossly deficient under NEPA and the APA, including but not limited to the following:

(a) Failing to gather and utilize accurate, up-to-date, and comprehensive baseline information on Sacajawea's bitterroot plants and habitat at and surrounding the Project site;

(b) Failing to take a hard look at the direct, indirect, and cumulative effects of Project activities on Sacajawea's bitterroot plants and habitat at the Project site and to the species as a whole; and

(c) Failing to disclose the details of and take a hard look at Sacajawea's bitterroot mitigation measures, their likeliness of occurring, and their effectiveness at reducing impacts.

103. By relying on the defective EA, the Forest Service's action approving the project is arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. § 706(2).

104. WHEREFORE, Plaintiff prays for relief as set forth below.

## THIRD CLAIM FOR RELIEF

*NEPA & APA Violations for Arbitrary & Capricious DN/FONSI & Failure to Prepare EIS.*

105. Plaintiffs hereby incorporate by reference all preceding paragraphs.

106. This third claim challenges the Forest Service's violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations, by authorizing the 2023 CuMo Exploration Project relying on the EA and FONSI without preparing an Environmental Impact Statement. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

107. NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A FONSI can be issued only if the Forest Service determines that the Project will not have any significant impact; if there is a substantial question about whether the Project "may" have a significant impact, an EIS is required.

108. The Forest Service's approval of the CuMo Exploration Project is a major federal action significantly affecting the quality of the human environment and requires preparation of a full EIS under NEPA for many reasons, and the Forest Service's FONSI is arbitrary and capricious.

109. When it discusses the "context" of the Project, the FONSI does not mention of the specific species, habitats, and resources at the Project site, including the uniquely important and at-risk populations of Sacajawea's bitterroot at the site, which are believed include 1/3 to 1⁄2 of all known individuals of this rare species.

110. When it discusses the Project's "intensity," the FONSI does not mention Sacajawea's bitterroot. Information in the Project record, including the Forest Service's Botany Report, show that there may be potentially significant direct, indirect, and cumulative adverse impacts to Sacajawea's bitterroot. The record also shows that impacts to Sacajawea's bitterroot are highly uncertain and controversial, and thus may be significant. And the Forest Service did not rationally rely on Project mitigation measures to conclude that impacts to this rare species will not be significant.

111. Because the Forest Service violated NEPA's requirements by approving the CuMo Exploration Project through an inadequate EA and DN/FONSI and by failing to prepare an EIS, its action is arbitrary, capricious, an abuse of discretion, not in accordance with the law,

without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. § 706(2).

112. WHEREFORE, Plaintiffs prays for relief as set forth below.

## FOURTH CLAIM FOR RELIEF

*Organic Act Violations for Failure to Minimize Impacts & Protect Public Resources.*

113. Plaintiffs hereby incorporate by reference all preceding paragraphs.

114. This fifth claim challenges the Forest Service's violations of the Organic Act and the Organic Act implementing regulations by authorizing the CuMo Exploration Project without protecting fish, wildlife, and the environment. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

115. Forest Service mining regulations require the Forest Service to maintain and protect fish and wildlife resources and to ensure mineral operations take all feasible steps to minimize adverse environmental effects. 36 C.F.R. 228.4(c)(3), 228.8(e).

116. As alleged above and will be further presented in briefing, the Forest Service failed to impose feasible requirements to minimize adverse effects to Sacajawea's bitterroot and riparian areas.

117. The Forest Service actions and inaction are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. § 706(2).

118. WHEREFORE, Plaintiffs pray for relief as set forth below.

//

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that the Forest Service's DN/FONSI and EA approving the 2023 CuMo Exploration Project are arbitrary, capricious, and/or contrary to the NFMA, NEPA, the Organic Act, and their implementing regulations;

B. Pursuant to the APA, vacate the DN/FONSI and EA;

C. Order the Forest Service to prepare an EIS;

D. Enjoin any further implementation of the Project;

E. Enter such temporary, preliminary, or permanent injunctive relief as Plaintiffs may hereafter seek;

F. Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and other applicable law; and

G. Grant Plaintiffs such further relief as may be just, proper, and equitable in order to remedy Defendant's violations of law and protect Plaintiffs and the public interest.

Dated June 25, 2025

Respectfully submitted,

*/s/ Bryan Hurlbutt*
Bryan Hurlbutt (ISB # 8501)
Andrew Hursh (ISB # 12644)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
bhurlbutt@advocateswest.org

*/s/ Roger Flynn*
Roger Flynn (Colo. Bar # 21078), *Pro Hac Vice Pending*

WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

*Attorneys for Plaintiffs*