ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

EMMA L. HAMILTON (CA Bar No. 325360)
Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
Albuquerque, New Mexico 87102
(202) 305-5689
emma.hamilton@usdoj.gov

BART M. DAVIS
United States Attorney
District of Idaho

*Attorneys for Federal Defendant*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FOREST SERVICE,<br><br>Federal Defendant,<br><br>and<br><br>IDAHO COPPER CORPORATION,<br><br>Intervenor-Defendant. | Case No. 1:25-cv-00329-AKB<br><br>**FEDERAL DEFENDANT'S MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

INTRODUCTION .......... 1

LEGAL BACKGROUND .......... 2

I. THE FOREST SERVICE ORGANIC ACT .......... 2

III. THE NATIONAL ENVIRONMENTAL POLICY ACT .......... 3

FACTUAL BACKGROUND .......... 5

STANDARD OF REVIEW .......... 6

ARGUMENT .......... 7

I. THE PROJECT COMPLIES WITH NFMA .......... 7

A. The Project is Consistent with MIST08 (RCAs) .......... 8

1. Potential new temporary road construction for the Project satisfies all elements of MIST08 .......... 8

2. Plaintiffs' challenges to the Project's MIST08 consistency fail. .......... 12

B. The Project is Consistent with BTGU01 (Sacajawea's Bitterroot) .......... 17

C. The Project is Consistent with BTST01 (Sacajawea's Bitterroot) .......... 20

II. THE PROJECT COMPLIES WITH NEPA .......... 23

A. The Forest Service Based its Analysis on Sufficient Baseline Data .......... 25

B. The Forest Service's Analysis of Potential Quantitative and Qualitative Impacts to Sacajawea's Bitterroot was Reasonable and is Entitled to Deference .......... 27

III. THE PROJECT APPROVAL FULFILLS THE FOREST SERVICE'S OBLIGATIONS UNDER THE ORGANIC ACT .......... 29

IV. PLAINTIFFS ARE NOT ENTITLED TO THEIR REQUESTED RELIEF .......... 30

CONCLUSION .......... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. for the Wild Rockies v. Brazell*,
3:12-cv- 466-MHW, 2013 WL 6200199 (D. Idaho Nov. 27, 2013)........................................ 25

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F3d 1105 (9th Cir. 2018) .................................................................................................. 3

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) .................................................................................................. 30

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) ........................................................................................ 4, 5, 6, 28

*Center for Biological Diversity v. U.S. Forest Service*,
No. CV 23-110-M-DWM, 2025 WL 3549515 (D. Montana Dec. 11, 2025)..................... 15, 23

*Ctr. for Biological Diversity v. Salazar,*
695 F.3d 893 (9th Cir. 2012) ............................................................................................. 4, 23

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
33 F.4th 1202 (9th Cir. 2022) .................................................................................................. 2

*Ctr. for Cmty. Action & Env't Just. v. FAA*,
61 F.4th 633 (9th Cir. 2023) .................................................................................................. 26

*Cuddy Mountain v. U.S. Forest Serv.*,
137 F.3d 1372 (9th Cir. 1998) .................................................................................................. 4

*Ecology Ctr. v. Austin*,
430 F.3d 1057 (9th Cir. 2005) ................................................................................................ 15

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983)................................................................................................................. 29

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
844 F.3d 1095 (9th Cir. 2016) ........................................................................................... 25, 26

*Hells Canyon Preservation Council v. Haines*,
No. CV-05-1057, 2006 WL 2252554 (D. Or. Aug. 4, 2006) ............................................ 14, 15

*Idaho Conservation Leage v. U.S. Forest Serv. (ICL I),*
*No.* 1:11-CV-00341-EJL, 2012 WL 3758161 (D. Idaho Aug. 29, 2012)....................... 6, 12, 13

*Idaho Conservation League v. U.S. Forest Serv. (ICL II)*,
No. 1:16-CV-0025-EJL, 2016 WL 3814021 (D. Idaho July 11, 2016).................... 6, 22, 23, 27

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ......................................................................................... 6, 15, 16, 19

*Landwatch v. Connaughton*,

905 F. Supp. 2d 1192 (D. Or. 2012) ........ 25

*Marsh v. Or. Natural Res. Council,*
490 U.S. 360 (1989) ........ 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29, 43 (1983) ........ 23, 29

*Native Ecosystems Council v. Erickson*,
804 Fed App'x 651 (9th Cir. 2020) ........ 19

*Native Ecosystems Council v. U.S. Forest Serv.*,
418 F.3d 953 (9th Cir. 2005) ........ 7, 23

*Native Ecosystems Council v. Weldon,*
697 F.3d 1043 (9th Cir. 2012) ........ 7, 9, 11, 12, 19, 22

*Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) ........ 7

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ........ 3

*Okanogan Highlands All. v. Williams*,
236 F.3d 468 (9th Cir. 2000) ........ 2

*Or. Nat. Desert Ass'n v. Jewell*,
840 F.3d 562 (9th Cir. 2016) ........ 25

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
957 F.3d 1024 (9th Cir. 2020) ........ 3, 7, 14, 22, 23

*Pac. Bell v. Pac. W. Telecomm. Inc.,*
325 F.3d 1114 (9th Cir. 2003) ........ 30

*Rock Creek All. v. U.S. Forest Serv.*,
703 F. Supp. 2d 1152 (D. Mont. 2010) ........ 13

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) ........ 4, 5, 7, 25, 27, 28, 29, 30

*Sierra Snowmobile Found. v. U.S. Forest Serv.*,
No. 2:21-cv-01913-DJC-SCR, 2025 WL 2495765 (E.D. Cal. Aug. 29, 2025) ........ 25

*Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dept. of Interior*,
608 F.3d 592 (9th Cir. 2010) ........ 15

*Union Oil Co. Of Cal. v. Smith*,
249 U.S. 337 (1919) ........ 2

*United States v. Weiss*,
642 F.2d 296 (9th Cir. 1981) ........ 2

*WildEarth Guardians v. Jeffries*,

370 F. Supp. 3d 1208 (D. Or. 2019) ........ 17, 18

**Statutes**

16 U.S.C. § 1604(a) ........ 3
16 U.S.C. § 1604(i) ........ 7
16 U.S.C. § 478 ........ 29
16 U.S.C. § 551 ........ 29
16 U.S.C. § 551 ........ 2
30 U.S.C. § 23 ........ 2
30 U.S.C. § 26 ........ 2
30 U.S.C. § 35 ........ 2
30 U.S.C. § 36 ........ 2
30 U.S.C. § 42 ........ 2
30 U.S.C. §§ 21-54 ........ 2
42 U.S.C. § 4332(C) ........ 3
5 U.S.C. § 706(2)(A) ........ 7

**Regulations**

36 C.F.R. § 219.15(d) ........ 7
36 C.F.R. § 228.1 ........ 3
36 C.F.R. § 228.8 ........ 30
36 C.F.R. Part 228A ........ 29
36 CFR 228.8 ........ 21, 22
40 C.F.R § 1508.9(a)(1) ........ 29
40 C.F.R. § 1508.1(j) ........ 4
40 C.F.R. § 1508.9(b) ........ 23
40 C.F.R. §§ 1508.1(j) ........ 3
40 C.F.R. Part 1500 (2024) ........ 4
90 Fed. Reg ........ 4

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFS | National Forest System |

## NOTE ON ADMINISTRATIVE RECORD CITATIONS

Citations to the U.S. Forest Service's Administrative Record that was lodged with the Court on December 19, 2025, Dkt. No. 27, are to the Bates page numbers in the lower right-hand corner of each page in the form "CuMoxxxxxx." Because Plaintiffs' opening brief cites the materials using an "AR" prefix rather than "CuMo," Federal Defendant will likewise cite the Administrative Record materials in the form "ARxxxxxx" for ease for reference.

**Map 2. Alternative B, Proposed Action** (AR001769, Environmental Assessment)



## INTRODUCTION

The Forest Service has a dual mandate under the Organic Act of 1897 that requires the agency to protect National Forest System (NFS) lands while allowing mineral exploration and development. The 2023 CuMo Exploration Project is a temporary mineral exploration project on the Boise National Forest by which Idaho Copper Corporation (Idaho Copper) will exercise its statutory right to explore a block of unpatented mining claims on the Forest. The limited authorized activities consist of drilling temporary exploration holes across 72.3 acres, over no more than 32 months, to attempt to locate molybdenum, copper, silver, rhenium, and tungsten. Following these activities, Idaho Copper will then fully reclaim all roads and drill sites.

In authorizing the Project, the Forest Service fulfilled its dual mandate by developing nearly 100 stringent mitigation measures that Idaho Copper must implement to limit the potential environmental impacts of the Project. The agency further complied with the National Forest Management Act (NFMA) and the National Environmental Policy Act (NEPA) by ensuring the Project is consistent with the Boise National Forest Plan and that its potential effects on environmental resources have been sufficiently analyzed and disclosed.

Plaintiffs' challenges largely recycle claims this Court has rejected in prior litigation over earlier iterations of the CuMo Project. But as detailed below, Plaintiffs fail to carry their burden of demonstrating that the Forest Service's determinations and analyses in the Project Decision Notice, Finding of No Significant Impact, and Environmental Assessment are arbitrary, capricious, or otherwise violate NFMA, NEPA, or the Organic Act. And in doing so, Plaintiffs consistently fail to afford the agency the deference required to its reasonable determinations of Forest Plan consistency, analyses of potential environmental effects, and assessment of the significance of those effects. The Court should grant Federal Defendant summary judgment on all claims.

## LEGAL BACKGROUND

### I. THE FOREST SERVICE ORGANIC ACT

The Forest Service Organic Act of 1897 imposes a dual mandate on the agency to protect National Forests while allowing mineral exploration and development under the Mining Law of 1872.[1] On one hand, the Forest Service must regulate the occupancy and use of national forests and preserve them from destruction. 16 U.S.C. § 551. On the other, the Organic Act reapplied federal mining law to National Forest System (NFS) lands to reopen them "to entry under the existing mining laws of the United States," and provided that notwithstanding any other provisions of the Organic Act, NFS lands "shall continue to be subject to such location and entry." *Id.* § 482. To facilitate this, § 551 provides that the Organic Act "shall [not] be construed as prohibiting" entry upon "national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof," but those who do so "must comply with the rules and regulations covering such national forests." *Id.* § 478. These provisions "evidence the important and competing interest[s]" of forest preservation and mineral development, and "allow the Forest Service to adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment of [] claims for mining purposes." *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 478 (9th Cir. 2000) (citation modified).

The Forest Service adopted such reasonable regulations by promulgating the Part 228A regulations under its Organic Act authority. *United States v. Weiss*, 642 F.2d 296, 298 (9th Cir.

[1] The Mining Law of 1872 gives "an express invitation to all qualified persons to explore the lands of the United States for valuable mineral deposits." *Union Oil Co. Of Cal. v. Smith*, 249 U.S. 337, 346 (1919); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 33 F.4th 1202, 1208 (9th Cir. 2022); 30 U.S.C. §§ 21-54. The Mining Law also authorizes qualified persons to stake or "locate" mining claims and mill sites on federal lands that are open to the operation of the Mining Law. 30 U.S.C. §§ 23, 26, 35, 36, 42.

1981); 36 C.F.R. § Part 28, Subpart A. These regulations "set forth rules and procedures through which use of the surface of [NFS] lands in connection with operations authorized by the United States mining laws . . . shall be conducted so as to minimize adverse environmental impacts on [NFS] surface resources." 36 C.F.R. § 228.1.

## II. THE NATIONAL FOREST MANAGEMENT ACT

NFMA governs the Forest Service's administration and management of national forests. It is primarily a planning statute, *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30, 736 (1998), and requires the Forest Service to develop a Land and Resource Management Plan, known as a "forest plan," for each national forest, 16 U.S.C. § 1604(a). Individual projects must be consistent with the forest plan. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F3d 1105, 1109-10 (9th Cir. 2018) (citing 16 U.S.C. § 1604(i)). In reviewing forest plan consistency under NFMA, courts may "conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) (citations omitted).

## III. THE NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is a procedural statute that requires federal agencies to prepare an Environmental Impact Statement (EIS) for "major federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(C). To determine whether impacts of a proposed action will be significant enough to warrant an EIS, the agency may prepare an Environmental Assessment. 40 C.F.R. §§ 1508.1(j), 1501.5.[2] If, based on the Environmental Assessment, the agency concludes

---

[2] The Council on Environmental Quality promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and amended them in 1986, 51 Fed. Reg. 15,618 (Apr. 25, 1986), again in 2020, 85 Fed. Reg. 43,304 (July 16, 2020), and again in 2024, 89 Fed. Reg. 35,442

that the proposed action will not significantly impact the environment, it issues a Finding of No Significant Impact (FONSI) in lieu of an EIS. An Environmental Assessment is a "concise public document," 40 C.F.R. § 1508.1(j), that need only include a "reasonably thorough discussion of the significant aspects of probable environmental consequences[,]" *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998), and take a "hard look" at the "likely" effects of the action. *Ctr. for Biological Diversity v. Salazar,* 695 F.3d 893, 916-17 (9th Cir. 2012).

While requiring agencies to analyze probable impacts of proposed actions, "NEPA imposes no substantive environmental obligations or restrictions." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025). "NEPA is a purely procedural statute that . . . simply requires an agency to prepare an EIS [or an Environmental Assessment]—in essence, a report." *Id.* In that report, "an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Id.* Indeed, "NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Id.*

"The limited scope of NEPA also circumscribes the scope of judicial review." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 880 (9th Cir. 2025). The Supreme Court recently emphasized that "[a] course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense." *Seven Cnty.*, 605 U.S. at 184.[3] To do this, judicial review of an agency's analysis "must account for the fact that NEPA is

(May 1, 2024). In early 2025, the Council issued an interim rule removing its NEPA regulations from the Code of Federal Regulations, 90 Fed. Reg 10,610 (February 25, 2025), but the claims in this case arise under the 2024 regulations, *see* AR001893-2028, and all citations are to the regulations as codified at 40 C.F.R. Part 1500 (2024).

[3] *Seven County* involved a challenge to an EIS, but its reasoning is "fully applicable" to judicial review of an Environmental Assessment. *Cascadia Wildlands*, 153 F.4th at 903.

a *purely procedural statute*." *Id.* at 180. And "a court should afford substantial deference" to an agency's identification and analysis of environmental impacts because such decisions require an agency to "make predictive and scientific judgments in assessing the relevant impacts (what are the likely impacts; do they rise to the level of 'significant'?)." *Id.* at 181. If they "fall within a broad zone of reasonableness," courts must defer to an agency's "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting [analysis document]." *Id.* at 183. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 185.

## FACTUAL BACKGROUND[4]

The 2023 CuMo Project is a proposal by Idaho Copper to conduct mineral exploration operations on a block of unpatented mining claims on the Boise National Forest in southwestern Idaho. AR001756. The Project limits operations from April 15 to December 15 each year, AR001881, over four years of exploration and two years for final reclamation. AR001756; *see also* SOF ¶ 9. The Project will use 5.5 miles of existing temporary roads and construct up to 8.9 miles of new temporary roads and up to 250 drill holes at up to 122 drill sites. AR001756. Exploratory drill sites are located along roads, SOF ¶ 6, and the total use of NFS lands for all project activities would be limited to 72.3 acres—less than 2.5% of the 2,917-acre project area. AR001770. All roads, drill sites, and stream crossings will be reclaimed following completion of the Project. AR001779. The exploration will be "results-driven, so the exact locations of new temporary roads, drill sites, and drill holes would be progressively identified based on the results from prior holes drilled." AR001756. Before each season, the Forest Service will "approve exact

[4] Additional detail and background are contained in Federal Defendant's "Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment" (SOF), filed herewith.

project locations in accordance with the requirements of the final approved Plan." *Id.*

The Forest Service first authorized the CuMo Project in February 2011. AR001754. Plaintiffs challenged the decision, and this Court remanded the portion of the 2011 decision and analysis related to potential groundwater impacts. *Idaho Conservation League v. U.S. Forest Serv. (ICL I)*, No. 1:11-CV-00341-EJL, 2012 WL 3758161, at *18 (D. Idaho Aug. 29, 2012). The agency completed additional groundwater analysis and issued a supplemental Decision Notice/FONSI and Environmental Assessment in 2015. Plaintiffs challenged that decision, and in 2016 this Court remanded portions of the 2015 decision and analysis because the Forest Service had not yet accounted for impacts to Sacajawea's bitterroot in the Project area resulting from the 2014 Grimes Fire. *Idaho Conservation League v. U.S. Forest Serv. (ICL II)*, No. 1:16-CV-0025-EJL, 2016 WL 3814021, at *17 (D. Idaho July 11, 2016). The Court noted that, "[b]ut for the change in circumstances to the [Sacajawea's bitterroot] species resulting from the Grimes Fire, the Court would be in a position to approve the Project." *Id.* at *15.

In 2023, Idaho Copper assumed control of the CuMo claim block and submitted a new proposed Plan—the 2023 CuMo Mineral Exploration Plan of Operations. AR001754. The 2023 CuMo Proposed Plan of Operations is "similar to the Forest Service's Selected Alternative (Alternative B) from the 2011 [Decision Notice]/FONSI, which were also the proposed operations of the Forest Service's Selected Alternative (Alternative B) in the 2015 [Decision Notice]/FONSI," other than slight decreases in duration, new road construction, number of drill sites and holes, and a slight increase in use of existing roads. AR001758.

## <u>STANDARD OF REVIEW</u>

Plaintiffs' claims are reviewed under the Administrative Procedure Act (APA). *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), *overruled in part on other*

*grounds*. A court may only set aside agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 180. An action is arbitrary and capricious only where the agency relied on factors "Congress has not intended it to consider," failed to consider important factors, offered an explanation inconsistent with the record, or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Or. Nat. Desert Ass'n*, 957 F.3d at 1033. This standard of review is "highly deferential, presuming the agency action to be valid." *Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation modified).

## ARGUMENT

### I. THE PROJECT COMPLIES WITH NFMA

NFMA requires that the Project be consistent with the standards in the Boise Forest Plan. 16 U.S.C. § 1604(i). Forest Service regulations call for project consistency to be documented in the decision, 36 C.F.R. § 219.15(d), but NFMA does not require the agency to "analyze and show" forest plan consistency in its environmental analysis documents. *Or. Nat. Desert Ass'n*, 957 F.3d at 1033. Instead, the proper inquiry is whether a court "can reasonably discern from the record that the Forest Service complied with" the forest plan "and thereby complied with NFMA." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005). In engaging in that inquiry, "[t]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Native Ecosystems Council v. Weldon,* 697 F.3d 1043, 1056 (9th Cir. 2012). Here, the Project's substantive consistency with the three Forest Plan provisions Plaintiffs challenge is reasonably discernable from the Administrative Record.

### A. The Project is Consistent with MIST08 (RCAs)

#### 1. Potential new temporary road construction for the Project satisfies all elements of MIST08.

Forest Plan Mineral and Geology Resources Standard 08 (MIST08) directs the Forest Service, in relevant part, to: "Locate new structures, support facilities, and roads outside [Riparian Conservation Areas (RCAs)]. . . . Where no alternative to road construction in RCAs exists, keep roads to the minimum necessary for the approved mineral activity. Close, obliterate, and revegetate such roads if no longer required for mineral or other management activities." AR002178. The "Forest Plan Consistency Checklist" confirms the agency's determination that the Project is consistent with MIST08. AR001353. And the materials in the Administrative Record demonstrate the Project is consistent with each of these elements of MIST08 and thus complies with NFMA.

The 2023 Plan of Operations makes clear that some stream crossings associated with new temporary roads would be necessary for Idaho Copper to access and explore all portions of its claim block. *See* AR001428 (Idaho Copper's claims overlaid on topographic map of the Project area); AR001769 (map showing approximate location of proposed temporary roads providing access to the southern portion of the Project/claim area, some of which cross streams). The 2023 Plan confirms that Idaho Copper will "construct all access routes with a minimum possible impact to surface resources," and proposed "stream crossings have been minimized." AR001419.

Indeed, the 2023 Plan of Operations is "similar to the Forest Service's Selected Alternative (Alternative B)" from the 2011 and 2015 Project approvals, which was termed the "Reduced Roads Alternative," AR001758, and which the agency developed and selected in 2011 to limit the Project's "effects on water quality (sedimentation) in the short term, as compared to" the proponent's original proposal. AR003905. Thus, the Record shows that the agency took steps in 2011 and 2015 to minimize road construction in RCAs, and Idaho Copper then largely adopted

this "Reduced Roads Alternative" in the 2023 Plan of Operations.

The Forest Service's consideration of alternatives also shows that it identified no feasible alternative to locating some roads and temporary stream crossings in RCAs. The agency determined "[e]xisting roads, even with directional drilling, are inadequate for accessing and analyzing the mineral resources throughout the Project Area," so "[r]elying solely on existing roads is not a viable alternative as it does not align with the proponent's need to retrieve core samples to extract detailed geologic data for determining the extent of the mineral deposit." AR004668. It considered a "Helicopter-Assisted Alternative" to reduce potential environmental impacts to resources including RCAs by "utilizing helicopter support to transport drilling equipment, supplies, and personnel and conducting helicopter-supported drilling on platforms" rather than new temporary roads. AR001781-82. This alternative "was dismissed in favor of more conventional, safer, and economically feasible methods." *Id.* And the Forest Service considered a "Riparian and Watershed Impact Reduction Alternative" that prohibited construction of "roads, drill sites, mud pits, and other structures within RCAs." *Id.* The agency noted that mitigation measures in the proposed alternative already "prevent the construction of drill sites within RCAs," and "the criteria considered before approving specific locations include identifying possible alternatives to placing facilities within RCAs, making this aspect of the alternative redundant." *Id.*

Ultimately, the agency found that "[t]he Project Area's topography and vegetation limitations dictate the necessity of the proposed road routes." AR004675. But the Project necessarily involves refining plans for subsequent exploration based on results obtained, so "not all proposed roads may be constructed." AR001766. The Project's required design features, *see* AR001773, thus reflect the agency's determination that the temporary routes proposed in the 2023 Plan of Operations, in the approximate locations on Map 2 of the EA (AR001769), may be

necessary for Idaho Copper to successfully explore its claim block.

To be clear, however, no portions of temporary roads may be constructed in RCAs except stream crossings that are *necessary* for that purpose. AR001778 (Water Resources Design Feature G (WR-G): "No new road building will occur within 500 feet slope distance for perennial streams, such as Grimes Creek, and within 250 feet slope distance for intermittent streams. The exception is when a stream crossing is necessary[.]").[5] This satisfies MIST08's requirement that new roads must be located outside RCAs unless no alternative exists, i.e., RCA intrusions are "necessary." And it reflects the agency's determination that "comprehensive geologic data collection necessitates more extensive access than the existing road network can provide." AR001783.

The Project's required mitigation measures also ensure construction in RCAs will be kept "to the minimum necessary." AR002178. Based on the configuration of temporary roads that may be necessary to fully implement the Project, Water Resources Mitigation Measure 9 (WR-9) limits road incursions in RCAs to a maximum of five stream crossings. AR001399 ("The *only* project activities that can occur within an RCA include 1) water pumping with storage of up to 10 gallons of fuel; (2) existing road use and maintenance; (3) existing temporary road reclamation; (4) *construction, maintenance, and reclamation of up to 5 new stream crossings with associated new temporary road*; and (5) hazard tree falling.") (emphasis added).

Plaintiffs incorrectly claim that the Project will allow more than five new stream crossings and additional incursions into RCAs. Pls.' Opening Br. in Supp. of Mot. for Summ J. 10, Dkt. No. 29-2 ("Pls.' Br."). No so. The Project expressly prohibits any new road construction in RCAs except necessary stream crossings, AR001778 (WR-G); allows no more than five stream crossings,

---

[5] This is a *more* protective buffer than the Forest Plan requires for RCAs, which delineates RCAs as 300 feet from perennial streams and 150 feet from intermittent streams. AR001031; SOF ¶ 59.

AR001399 (WR-9); and provides that any new road construction must be approved by the Forest Service under an annual operations plan, AR001381 (MG-1), through which the agency will require "all practicable alternatives be considered before impacting RCAs," AR001353. The map Plaintiffs cite for their erroneous claim primarily delineates the NEPA effects analysis areas for surface water. Pls.' Br. 10 (citing AR000890). It does not purport to show RCAs and proposed roads to scale (indeed, "temporary roads will generally be 10 feet wide," AR001766, while RCAs range from 100-300 feet on either side of a waterway), and thus does not clearly show if and where proposed temporary roads would actually cross streams or enter RCAs. The map of the proposed action in the Environmental Assessment (AR001769, Map 2) provides a more appropriately-scaled representation of where temporary roads may cross streams in the Project Area. AR001769. And in any event, a map showing general locations of potential temporary roads does not supersede the clear limitations on RCA intrusions in the Project's design features.

Additional mitigation measures ensure stream crossings will be further limited to only those that are necessary to ongoing mineral exploration, as the Forest Service "evaluate[s] the reasonable and logical progression of road construction" before approving each annual plan. AR004675. Indeed, "[p]rior to construction of any new road," Idaho Copper must "submit the final road location and designs to the Forest Service for review and approval." AR001416. Minerals and Geological Resources Mitigation Measure 1 (MG-1) requires annual operating plans to "be consistent with the approved 2023 CuMo Plan of Operations" (including WR-G's RCA limitations) and include "exact drill site and road locations" and "road maintenance and use proposed." *Id.* The Forest Service interprets MG-1 as requiring consideration of "all practicable alternatives" before approving roads that impact RCAs, AR001353, and notes that "existing stream crossings would be prioritized and used before construction of new stream crossings are

considered." *Id.* These provisions demonstrate that the Project satisfies MIST08's second element: road construction in RCAs will be kept to the minimum necessary where no alternatives exist.[6]

**2. Plaintiffs' challenges to the Project's MIST08 consistency fail.**

The Forest Service found that up to five total stream crossings may be necessary for the Project and imposed specific design features and mitigation measures to minimize the effects of any such crossings, consistent with MIST08. In challenging the agency's compliance with MIST08, Plaintiffs insist that all necessary stream crossings must be approved prior to the start of Project implementation, and failure to do so violates NFMA. But far from reflecting "improper reliance on future compliance," Pls.' Br. 10-13, or "inadequate design features to ensure future MIST08 compliance," *id.* at 13-16, the Record fully supports the agency's front-end assessment of the need for up to five stream crossings, the iterative nature of exploratory drilling, and the agency's binding commitment to authorize only necessary new road construction.

As a threshold matter, this Court already rejected a substantially similar MIST08 challenge to the CuMo Project in 2011. *See ICL I*, 2012 WL 3758161, at *19-22. Then, Plaintiffs argued "the Forest Service [] violated NFMA by locating roads, drill pads, and mud pits in [RCAs] without first determining that no alternatives exist and without minimizing road construction in RCAs, as required by the Boise Forest Plan." *Id.* at *19. This Court reviewed the administrative record and "conclude[d] that the CuMo Project is consistent with the Forest Plan and, in particular, with MIST08[.]" It explained that "[t]he Forest Service properly evaluated the Forest Plan as required by NFMA and set forth a plan for approving any encroachments into an RCA

[6] The Project satisfies the final relevant element of MIST08 by requiring reclamation of existing and new temporary access roads, drill sites, and stream crossings, and Plaintiffs do not claim otherwise. AR001779; AR001673 (reclamation specifications). Numerous required mitigation measures also ensure all RCA disturbances will be limited. *See, e.g.*, AR001398-99 (WR-1, WR-2, WR-3, WR-6, WR-8, WR-9); AR001378 (FI-1, FI-2, FI-3); AR001380 (HM-1, HM-2).

that is unavoidable and the monitoring and mitigation efforts to be used in such a case." *Id.* at *22. And the Court further explained that "the Forest Service's analysis and decision in the [Environmental Assessment] and [Decision Notice]/FONSI are not arbitrary and capricious and in accord with NFMA's requirements," particularly where the agency "noted its limited authority to influence activities . . . [that] are reasonably incident to mining, not needlessly destructive, and otherwise comply with applicable state and federal law." *Id.* at *21. Here, where "the proposed operations in the 2023 CuMo Plan . . . are similar to the Forest Service's [2011] Selected Alternative," AR001758, the Court should similarly reject Plaintiffs' MIST08 claim.

Plaintiffs mischaracterize the Record in claiming the agency deferred all analysis of whether stream crossings in RCAs are necessary to the annual operating plans. Pls.' Br. 10-13. As described above, the Forest Service's prior development of Alternative B (now the 2023 CuMo Plan of Operations) to reduce roads in RCAs, combined with the agency's consideration of other alternatives that would limit road construction in the 2023 Project, demonstrate the potential need for the proposed new temporary roads and up to five stream crossings for Idaho Copper to fully implement this exploratory Project on its claim block. Indeed, the agency expressly determined in the Environmental Assessment that no alternative routes for the temporary roads would be feasible. *See* AR001784 ("The project area's topography and vegetation limitations dictate the necessity of the proposed road routes."). This determination shows no alternatives existed to siting project components in RCAs. *See, e.g.*, *Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1186 (D. Mont. 2010) ("The review of alternatives satisfies the Fish Strategy standard MM-2 requirement that the agency review alternatives to placement in a Conservation Area.").

The annual operations plans required by MG-1 provide additional opportunities for the Forest Service to confirm consistency with MIST08 as Project implementation progresses. The

agency will require that "all practicable alternatives be considered [in annual operating plans] before impacting RCAs" via stream crossings, AR001353, and no more than five total already-considered crossings may be approved, AR001399. Ignoring all this, Plaintiffs inaccurately claim that inherent uncertainties surrounding which, if any, of the five potentially necessary stream crossings may be required and approved somehow violates MIST08. Pls.' Br. 10-13.

None of the cases Plaintiffs rely on support this argument. *Hells Canyon Preservation Council v. Haines*, No. CV-05-1057, 2006 WL 2252554 (D. Or. Aug. 4, 2006), did not involve exploratory drilling where the precise location of future operations necessarily depended on initial results. *See* Pl.'s Br. 10-11. The nonbinding opinion also predated the Ninth Circuit's confirmation that agency actions must be consistent with forest plans, but agencies need not "analyze" such consistency in NEPA documents. *Or. Nat. Desert Ass'n*, 957 F.3d at 1033.[7] Further, *Hells Canyon* found the Forest Service's consistency determination for a forest plan mining standard was insufficient because the agency had erroneously concluded that the standard did not apply at all to settling ponds and relied on a "semantic argument" that the decision did not "locate" any roads in RCAs because the actual location would be approved later. 2006 WL 2252554, at *8-9. By contrast, here the Forest Service excluded drill pads from RCAs but determined some stream crossings (though no more than 5) may be required because "comprehensive geologic data collection necessitates more extensive access than the existing road network can provide." AR001783. Idaho Copper will annually assess whether new temporary

[7] For the same reason, Plaintiffs' argument that the Project is inconsistent with MIST08 because it does not reference the standard by name in the Environmental Assessment or supporting technical reports is meritless. Pls.' Br. 11 & n.4; *Or. Natural Desert Ass'n*, 957 F.3d at 1033 (substantive NFMA violations may be "contained within written analyses required by [NEPA]," but "NFMA and the APA, on their own, [do not] require the Forest Service to 'analyze and show,' in a contemporaneous written document, that each of its actions conform to the applicable forest plan").

roads can be located outside RCAs as the Project evolves, but the "semantic argument" that informed the holding in *Hells Canyon* is not present here. 2006 WL 2252554, at *8-9.

Plaintiffs' reliance on *Center for Biological Diversity v. U.S. Forest Service*, No. CV 23-110-M-DWM, 2025 WL 3549515 (D. Montana Dec. 11, 2025), *appeal docketed*, is even further misplaced because they ignore a key portion of the district court's opinion. *See* Pls.' Br. 12-13. On the unique facts of that case, including "the enduring dilemma of grizzly bears and roads," the court found a timber harvest project had improperly deferred NEPA and NFMA compliance to the implementation stage. 2025 WL 3549515, at *3-4, 6-10. But the court expressly distinguished projects like this one, suggesting that inherent uncertainties in the mineral exploration context mean some analysis *can* properly be deferred to future implementation stages for such projects. 2025 WL 3549515, at *3 ("A condition-based management approach" has been historically applied to "situations involving inherent uncertainties in project activities, such as projects involving mineral exploration."). Indeed, "if mining companies knew the precise location of mineral deposits before drilling, exploration would not be required." *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dept. of Interior*, 608 F.3d 592, 600 (9th Cir. 2010). Thus, "[i]n approving mineral exploration projects," agencies must "balance these uncertainties" with other legal obligations including environmental effects analysis requirements. *Id.*

Plaintiffs also rely on *Ecology Ctr. v. Austin*, 430 F.3d 1057 (9th Cir. 2005), *see* Pls.' Br. 12, but the Ninth Circuit explicitly overruled its NFMA holding in that case. *Lands Council v. McNair*, 537 F.3d at 990, 992 ("overrul[ing] *Ecology Center*" and holding that "*Ecology Center* illustrates the consequences of failing to grant appropriate deference to an agency"). The Ninth Circuit emphasized that, rather than dictating on-the-ground data verification and monitoring an agency must conduct before approving a project, a court's "proper role is simply to ensure that the

Forest Service made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Id.* at 993 (quoting *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378 (1989)).

Finally, Plaintiffs devote several pages to arguing the secondary, annual consistency determination the Project requires before any new road construction is approved is "inadequate" to ensure future MIST08 compliance. Pls.' Br. 13-16. Plaintiffs argue the 2011 version of the Project required a "checklist" to confirm annual MIST08 consistency while the 2023 Project requires "inferior" annual operating plans to achieve the same result. Pls.' Br. 13-16. These arguments fail. As noted above, the agency's alternatives analysis demonstrates that the 2023 Project complies with MIST08 because implementation potentially requires the proposed new temporary roads and up to five stream crossings. The annual approvals MG-1 requires simply provide another opportunity for the agency to confirm MIST08 consistency as the Project progresses, and to further minimize RCA impacts if fewer than five stream crossings are necessary. But the Project's consistency with MIST08 does not depend on this secondary phase of approvals.

Moreover, although MG-1 does not expressly mention an RCA alternatives analysis as a required element in the annual plans, it makes clear that new road construction will only be approved if it is "consistent with the approved 2023 CuMo Plan of Operations." AR001416; *see* AR001765 ("prior to surface disturbance, the Forest Service would approve exact project locations *in accordance with the requirements of the final approved Plan*" (emphasis added)). The Plan of Operations includes the binding requirement in WR-9 that only *necessary* stream crossings will be approved annually in RCAs with no more than five total crossings. AR001399. And the Record clearly shows that the Forest Service intends the annual operating plan approval process to require consideration of alternatives to RCA intrusions. *See, e.g.*, AR004670 ("alternatives to placing facilities within RCAs are [] a component of the criteria considered prior to approving specific

locations of the results-driven process"); AR004677 ("the criteria considered before approving specific locations include alternatives to placing facilities within RCAs"); AR001353 ("Annual operating plan as required under Appendix 6.2 requires all practicable alternatives be considered before impacting RCAs"); AR005001 ("the checklist is now called the annual operating plan").

In sum, Forest Plan consistency requirements indeed "appl[y] at the time of the decision," *see WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1234 (D. Or. 2019) (finding future mitigation measures insufficient to demonstrate forest plan consistency when they "ha[d] not been prepared or funded" at the time of the decision). And here, the Forest Service properly assessed the proposed action and potential alternatives, determined there were no alternatives to constructing up to five stream crossings in RCAs, and included numerous binding mitigation measures to ensure only necessary RCA intrusions are authorized as the project progresses and related RCA impacts are minimized. The Project is fully consistent with MIST08.

**B. The Project is Consistent with BTGU01 (Sacajawea's Bitterroot)**

The Boise Forest Plan's Botanical Resources Guideline 1 (BTGU01) states in relevant part: "For site/project-scale analysis, suitable habitat should be determined for Sensitive species within or near the project area. Conduct surveys for those species with suitable habitat to determine presence." AR002163. The Forest Plan defines "guidelines" as "represent[ing] a preferred or advisable course of action generally expected to be carried out." AR002130. "Deviation from compliance does not require a Forest Plan amendment," but "rationale for deviation should be documented in the project decision document."[8] AR002130.

---

[8] Plaintiffs argue the Forest Service "failed to comply" with BTGU01, focusing only on the guideline's substantive recommendations. As described below, the Forest Service rationally determined the 2017 baseline data sets (as supplemented by 2018-2022 data where appropriate) were consistent with BTGU01 for Sacajawea's bitterroot. But even if the Court found the use of prior survey data to depart from the guideline, the rationale for that "deviation" is thoroughly

In reviewing the 2023 CuMo Project proposal, the Forest Service considered the most recent habitat and species survey data and modelling for Sacajawea's bitterroot and rationally determined that the data was sufficient to inform its subsequent environmental analysis of the proposed Project. Plaintiffs' argument that the agency's consideration of previously collected (and supplemented) survey data is inconsistent with BTGU01's "survey requirement," Pls.' Br. 17-20, finds no support in the Forest Plan, the Administrative Record, or the law.

The Forest Service explained that "[i]nitial field observations and documentation of Sacajawea's bitterroot within the project area began in 2005," and "laid the groundwork for more detailed and targeted surveys in 2007, 2011, 2012, 2015, 2016, 2017, 2021, and 2022." AR001800. The agency determined that datasets documenting species habitat and presence in 2017 "offer the most recent and complete overview of the population post-disturbance events, including wildfires and road construction." *Id*. Indeed, these data sets were collected "after events that may have changed existing conditions, such as new road construction in 2011 or wildfires in 2014 and 2016. No minerals exploration or other Forest management activities have occurred in the general vicinity of the population since the 2017 surveys." AR000483-84.

The comprehensive data included in the 2017 surveys spans nearly 500 pages, *see* AR003284-482 (Sacajawea's Bitterroot Baseline Survey Report); AR003483-723 (Sacajawea's Bitterroot Known Occurrence Survey Report). The surveys explain their methodology in detail. AR003292-95. The 2017 data was bolstered by a 2018 habitat assessment "in the 2016 Pioneer Fire perimeter within a 500-meter buffer of documented Sacajawea's bitterroot individuals, regardless of the surrounding area's burn status, to assess existing conditions." AR000485. And 2021-2022 clearance surveys covered 67 acres in the Project area and did not identify changes in

---

documented in the decision and Administrative Record and is thus still consistent with BTGU01.

the existing condition that would support the need for new comprehensive data. AR000485.

Nothing in BTGU01 suggests the Forest Service must conduct new surveys for sensitive species every time a project is proposed. The Forest Service adequately explained in the Environmental Assessment (AR001811) and Botanical Resources Report (AR000483-84) why the thorough 2017 baseline survey and modelling data in the Project area (as supplemented in 2018 and recent clearance surveys in 2021 and 2022) was sufficient for its analysis of the Project. The Forest Service's implementation of its Forest Plan "is entitled to substantial deference," *Native Ecosystems Council*, 697 F.3d at 1056, and this is precisely the type of "agency[] determination in an area involving a high level of technical expertise," to which courts must be "most deferential." *See Lands Council*, 537 F.3d at 993 (citation modified); *id.* at 993-94 ("[A]s non-scientists, we decline to impose bright-line rules on the Forest Service regarding particular means that it must take in every case to show us that it has met the NFMA's requirements."); *Native Ecosystems Council v. Erickson*, 804 Fed App'x 651, 655 (9th Cir. 2020) (rejecting NFMA claim that agency failed to use best available science as courts "are required to apply the highest level of deference in our review of the Forest Service's scientific judgments").

Plaintiffs plainly would have preferred the Forest Service conduct new, comprehensive surveys in 2023, Pls.' Br. 17, but they fail to point to any legal requirement that the agency must do so or any facts that render the comprehensive 2017 surveys stale. Plaintiffs claim the agency's rationale is flawed because it suggests the 2021 and 2022 surveys "are more significant than they really are." *Id.* at 18-19. But the Forest Service never claimed the 2021-2022 surveys were comprehensive. AR00484. They did, however, "result in 2 newly observed individuals outside the 2017 delineated occupied habitat," so the baseline was updated. *Id.* And, more to the point, they support the Forest Service's reasoned and reasonable conclusion that conditions had not changed

in such a way as to support new comprehensive surveys. It is precisely this type of determination that is in the agency's expertise and to which deference is owed.

Further, post-2017 data in the Record also dispels Plaintiffs' unsupported speculation that lagging effects from fires and climate change have changed suitable habitat or species occurrences in the Project area such that the 2017 baseline surveys are inadequate. Pls.' Br. 18-19. In 2022, a Forest Service ecologist "visited the Sacajawea's bitterroot [] population located in the CuMo project area," to "complete a qualitative, ocular assessment of the dozer- and hand-constructed fire lines that passed through the population along the 2014 Grimes and 2016 Pioneer fires' perimeters." AR002814. The field visit "occurred roughly 8- and 6-years post fires, providing [] an opportunity to qualitatively assess vegetation recovery." *Id.* The ecologist noted that post-fire species recovery was occurring. AR002815. Thus, the Record contradicts Plaintiffs' claim that the Forest Service ignored or failed to consider lagging "effects" from fires after the 2017 baseline data was collected (a claim that also improperly conflates NEPA's effects analysis requirements with NFMA's Forest Plan consistency requirements). *See* Pls.' Br. 19-20.

At bottom, nothing in BTGU01 requires the Forest Service to conduct new surveys for each sensitive species if scientifically sound and comprehensive data already exists for the Project area. Plaintiffs' claim to the contrary fails.

### C. The Project is Consistent with BTST01 (Sacajawea's Bitterroot)

Forest Plan Botanical Resources Standard 1 (BTST01) provides that "[m]anagement actions that occur within occupied sensitive plant species habitat must incorporate measures to ensure habitat is maintained where it is within desired conditions, or restored where degraded." AR002162. Based on comprehensive 2017 surveys and habitat modelling, the Forest Service estimated occupied habitat by applying a 20-meter buffer to the 13,735 individuals identified from

2011 through 2017 and the two additional individuals identified in 2022. AR001802. "[T]he total estimated occupied habitat in the project area as of 2022 is 58.3 acres." *Id.*

The Forest Service's consistency determination for the Project explains that, in applying Forest Plan standards to exploratory drilling proposals, determinations are necessarily "based on the recognition that the Forest Service has limited authority to influence activities submitted under the 1872 Mining Law," and "may not deny [a] Plan of Operation provided that the activities proposed are reasonably incident to mining, not needlessly destructive and otherwise comply with applicable state and federal law." AR001329. Thus, Forest Plan standards and guidelines "must be applied to the CuMo project proposal in a manner that meets the requirements of 36 CFR 228.8 while avoiding unreasonable requirements that would deny the proponent from exercising their statutory rights under U.S. mining laws." *Id.*

Accordingly, the 2023 CuMo Project acknowledges that Sacajawea's bitterroot habitat will be adversely impacted by the Project but requires numerous mitigation measures to ensure maintenance of the existing Sacajawea's bitterroot population and to ensure occupied habitat is both maintained and rehabilitated following the conclusion of Project activities. "During project scoping and the resulting environmental analysis, the Forest Service[] identified and developed mitigation measures to minimize the environmental effects of the Proposed Action to the extent feasible in accordance with 36 CFR 228.8." AR000497; *see also, e.g.*, AR001393 (VG-1: requiring "[b]otanical clearance surveys prior to any new construction and any road maintenance activities on temporary roads (existing or new) within the project area"); AR001394 (VG-6: requiring felled hazard trees in Sacajawea's bitterroot habitat to "remain in place where they were felled to reduce additional harm to individual plants and pollinators from skidding operations and provide pollinator habitat"); AR001395 (VG-12: establishing habitat buffer zones where various

mitigation measures will be applied); *id.* (VG-13: "No new temporary road construction will occur in Sacajawea's bitterroot–occupied habitat."); AR001396-97 (VG-14 through VG-24: all applying mitigation measures to limit impacts on Sacajawea's bitterroot and its habitat). In all, twenty-five required mitigation measures specifically mention Sacajawea's bitterroot. AR001374-1405. The Forest Service determined that "the mitigation measures would reduce impacts" such that individually impacted plants are expected to recover in 3-5 years following Project implementation, and less than 1 percent of the total Sacajawea's bitterroot population will experience direct loss. AR000539. Therefore, the Forest Service determined that the Project is consistent with BTST01 by "reduc[ing] impacts to known and potential sensitive plant species habitats and maintain at existing conditions." AR001348. This rational determination is "entitled to substantial deference." *See Native Ecosystems Council*, 697 F.3d at 1056.

Plaintiffs argue that the Forest Service failed to "demonstrate" consistency with BTST01 because the agency did not expressly "identif[y]" particular areas of Sacajawea's bitterroot habitat that are meeting desired conditions or are degraded. Pls.' Br. 20-21. Again, Plaintiffs fail to demonstrate a legal violation because nothing in BTST01 or NFMA requires the agency to expressly identify or delineate the conditions of particular habitat areas. *See Or. Nat. Desert Ass'n*, 957 F.3d at 1033. And unsurprisingly, this Court rejected the same argument in Plaintiffs' prior challenge to the CuMo Project. In *ICL II*, Plaintiffs "allege[d] the Forest Service violated NFMA and Standard BTST01 by failing to identify the full extent of the [Sacajawea's bitterroot] habitat at the Project site, ensure occupied habitat in desired conditions is maintained, and ensure occupied habitat is restored." 2016 WL 3814021, at *16. The Court found "no fault with the Project's proposed design features, monitoring measures, and mitigation with respect to [Sacajawea's bitterroot]," because the "Project provides for avoidance, monitoring, and mitigation measures

designed to maintain and minimize the impact on the [species] population in the Project Area to the maximum extent possible," and "[t]hese measures are sufficient to satisfy the requirements to maintain [Sacajawea's bitterroot] habitat and protect forest resources." *Id.* at *17. The Court identified NEPA and NFMA violations solely because of "the change in circumstances to the [species] resulting from the Grimes Fire," *id.* at *15—circumstances that are now accounted for in the 2023 analysis. Just as in 2016, this Court should hold that the Project's ample avoidance, monitoring, and mitigation requirements show consistency with BTST01 and NFMA compliance.

In sum, the Record supports the Forest Service's rational determination that the Project is consistent with all relevant Forest Plan provisions. NFMA compliance is not measured by how often the agency mentions a particular provision by name. Rather, "[t]he question is whether [the Court] can reasonably discern from the record that the Forest Service complied with [MIST08, BTGU01, and BTST01] and thereby complied with NFMA." *See Native Ecosystems Council*, 418 F.3d at 962; *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, (courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (citation modified)). Plaintiffs fall far short of demonstrating that "the Forest Service made a clear error in judgment" in concluding that the Project "meets the requirements of the NFMA and [the Boise] Forest Plan." *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. The Court should reject Plaintiffs' NFMA claims.

## II. THE PROJECT COMPLIES WITH NEPA

An Environmental Assessment satisfies NEPA by taking "a 'hard look' at the likely effects of the proposed action," including foreseeable direct and indirect impacts. *Salazar*, 695 F.3d at 916-17 (citations omitted). This includes "brief discussions of the need for the proposal, of alternatives as required by [statute], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). Importantly,

however, an Environmental Assessment is to be "a *concise* public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." *Id.* § 1508.9(a) (emphasis added).

The Project's Environmental Assessment and detailed Botanical Report it incorporates by reference more than satisfy NEPA's requirements for analysis of potential effects on Sacajawea's bitterroot. The Environmental Assessment detailed the purpose and need for the Project, AR001759, identified a proposed alternative that meets that purpose and need, and considered a "No Action" alternative for baseline comparison purposes. AR001764-91. It then analyzed potential impacts to a variety of resources under both alternatives. AR001792-1870. This included a section detailing the existing condition of Sacajawea's bitterroot in the Project area, AR001802, and analyzing the Project's potential effects on the species under both alternatives. AR001804-08. The agency engaged in both a quantitative analysis of potential effects where "[t]he Forest had sufficient information to quantify impacts to Sacajawea's bitterroot known population and modeled potential habitat for road construction, drill site construction, road maintenance, and reclamation," AR001806, and a qualitative evaluation of "redundancy, resilience, and representation" to assess potential species-level impacts. AR001806. The Botanical Report includes further Sacajawea's bitterroot analysis across more than 70 pages. AR000475-550.

Plaintiffs argue the Forest Service relied on an "inadequate baseline" by utilizing the 2017 survey data, Pls.' Br. 24-25, and that the agency's effects analysis is based on "misrepresentations and unsupported assumptions," *id.* at 25-28. In doing so, however, Plaintiffs ignore the Supreme Court's recent NEPA "course correction," in which it explained that "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting

[environmental assessment]. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven Cnty.*, 605 U.S. at 180-81, 184. The Forest Service's choices fall well within that zone.

**A. The Forest Service Based its Analysis on Sufficient Baseline Data**

NEPA requires only that an agency conduct a reasonable analysis of anticipated impacts with available baseline information. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) ("An agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method."); *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016) (upholding estimation of baseline conditions by extrapolation). Indeed, courts have found that a NEPA violation occurs only where an agency ignored existing information that it should have considered as part of the baseline. *See All. for the Wild Rockies v. Brazell*, 3:12-cv- 466-MHW, 2013 WL 6200199, at *27 (D. Idaho Nov. 27, 2013) (Plaintiffs must show agency ignored existing data); *cf. Cent. Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012) ("The Forest Service had more recent baseline data available to it, but stated that the older data was adequate and that newer data was measured at different points."); *Sierra Snowmobile Found. v. U.S. Forest Serv.*, No. 2:21-cv-01913-DJC-SCR, 2025 WL 2495765, at *5 (E.D. Cal. Aug. 29, 2025) ("the environmental baseline can be an estimation"). But an agency's assessment of baseline conditions "must be based on accurate information and defensible reasoning." *Or. Nat. Desert Ass'n*, 840 F.3d at 570.

Here, the Botanical Report explains that "[t]he 2017 surveys occurred after events that may have changed existing conditions, such as new road construction in 2011 or wildfires in 2014 and 2016," that no new minerals exploration or other management activities have occurred in the

general vicinity since the 2017 surveys, and that "other data sets, including the 2021 and 2022 botanical clearance survey results" provide "additional information that enhances the 2017 baseline data sets." AR000484. Additionally, the Forest Service relied on its expertise and post-2017 Project site visits to conclude that the detailed and comprehensive survey and modelling data collected in 2017 (and supplemented in 2018-2022) formed a sufficient environmental baseline. *See* AR003284-482 (Baseline Survey Report); AR003483-723 (Known Occurrence Survey Report); AR002814 (2022 report on ocular assessment). It was thus reasonable for the agency to conclude that the "[b]aseline datasets from 2017," as supplemented by the 2021 and 2022 botanical clearance surveys, "offer the most recent and complete overview of the population post-disturbance events, including wildfires and road construction." AR001800.

Plaintiffs argue the 2017 data is "stale" and "outdated," rehashing their NFMA argument that the agency must collect comprehensive new data to account for a "lag-time" in post-fire impacts. But Plaintiffs offer no evidence that post-fire habitat conditions have changed so much since 2017 that it was irrational to rely on comprehensive 2017 survey data, or that the agency ignored other existing data. Plaintiffs merely posit that lagging effects "from the 2014 and 2016 fires and firefighting activities, plus effects from climate change and invasive weeds that *could* have occurred over the last 8 years" render the baseline data insufficient. Pls.' Br. 24 (emphasis added).[9] But Plaintiffs' suppositions fall far short of overcoming the substantial deference owed to Forest Service experts making such scientific and technical determinations. And they certainly do not satisfy Plaintiffs' burden to demonstrate that the agency's analysis violates NEPA. *Ctr. for*

---

[9] Plaintiffs are also wrong that even if some portions of the Project area "have still never been surveyed," it demonstrates an improper NEPA baseline. *See* Pls.' Br. 24. The Ninth Circuit has held unequivocally that "[a]n agency need not conduct measurements of actual baseline conditions in every situation." *Great Basin Res. Watch*, 844 F.3d at 1101.

*Cmty. Action & Env't Just. v. FAA*, 61 F.4th 633, 639-40 (9th Cir. 2023).

In 2016, this Court found that the agency's analysis of the CuMo Project's potential environmental effects largely satisfied NEPA, and "[b]ut for the change in circumstances to the [Sacajawea's bitterroot] species resulting from the Grimes Fire, the Court would be in a position to approve the Project." *ICL II*, 2016 WL 3814021, at *15. The agency's analysis of effects to the species in the 2023 CuMo Project relies on a baseline that accounts for conditions following the Grimes Fire. The agency sufficiently explained its reasonable determination that no subsequent changes have rendered this baseline information stale, and Plaintiffs have not identified any new or overlooked evidence that would overcome the "substantial deference" owed to the agency's reasoned determination. *Seven Cnty.*, 605 U.S. at 180-81.

**B. The Forest Service's Analysis of Potential Quantitative and Qualitative Impacts to Sacajawea's Bitterroot was Reasonable and is Entitled to Deference**

Plaintiffs next assert that the Forest Service's determination that overall effects to the species would be insignificant improperly omits the agency's qualitative analysis of potential species impacts and potential indirect effects, Pls.' Br. 25-26, and that the agency's quantitative estimation that 135 individual plants may be directly affected by the Project is "arbitrary," *id.* at 27-28. The Environmental Assessment and Botanical Report directly rebut Plaintiffs' claims.

The Botanical Report explains that the Forest Service supplemented its qualitative analysis with "a quantitative assessment for proposed activities when the Forest had sufficient information to quantitatively assess direct impacts for road construction, drill site construction, road maintenance, and reclamation." AR000490. The Quantitative Assessment section describes in detail the scientific methods the agency employed to quantify impacts for specific activities using survey data, modelled habitat, and GIS imaging. AR000490-91; AR000517-18. The report details how the agency calculated potential impacts once required mitigation measures are implemented.

AR000517 (explaining approximately 515 individuals (3.7% of the population) were located in areas where drill site construction may occur, 96 of which are located in roads, that "[a]ll the mitigations when considered as a whole would reduce the impacts experienced by the individuals residing outside the roadbeds and road cuts," and thus "it is reasonable to conclude that proponents would be able to keep impacts to no more than the direct loss of 135 individuals or less than 1 percent of the population"). The agency reasoned that "[t]hrough implementation of the mitigation measures, proposed activities may be able to avoid direct impacts to most individuals and limit indirect impacts to within the 40-foot disturbance footprints." AR00536. Indeed, thirty-six required mitigation measures will help minimize effects on botanic resources, fifteen of which are specific to Sacajawea's bitterroot. AR001809-10. And the Botanical Report contains a lengthy analysis of qualitative, indirect, and cumulative impacts. AR00531-39. It concludes with a detailed list of rationales supporting the agency's conclusion that "the 2023 CuMo Exploration Project with mitigation measures may impact individuals but is not likely to cause a trend to federal listing or loss of viability for the R4 Sensitive species" including Sacajawea's bitterroot. AR000540.

Plaintiffs argue this analysis is too "vague," *see* Pls.' Br. 27, but the Supreme Court has admonished that "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *See Seven Cnty.*, 605 U.S. at 181. Plaintiffs' assertions that the Forest Service's analysis is unsupported or misrepresents data are, in essence, challenges to the Forest Service's conclusions about the severity of the Project's potential impacts to Sacajawea's bitterroot and the efficacy of the required mitigation measures to limit those impacts. But this "is a technical, scientific issue where deference to agency technical expertise is at its apogee." *Cascadia Wildlands*, 153 F.4th at 906. Plaintiffs may disagree with the agency's conclusion that the Project

is unlikely to directly or indirectly affect more than 1 percent of the total population of Sacajawea's bitterroot. But "[b]lack-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Seven Cnty.*, 605 U.S. at 182 (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

In sum, the Forest Service's NEPA analysis falls within the "broad zone of reasonableness" that the Court "should not micromanage." *Seven Cnty.*, 605 U.S. at 183. The agency prepared "a concise public document" that "[b]riefly provide[s] sufficient evidence and analysis" supporting the FONSI. 40 C.F.R § 1508.9(a)(1). NEPA requires no more, and Plaintiffs' substantive opposition to the Project does not render the Forest Service's analysis arbitrary or capricious.

## III. THE PROJECT APPROVAL FULFILLS THE FOREST SERVICE'S OBLIGATIONS UNDER THE ORGANIC ACT

Finally, Plaintiffs briefly assert a derivative argument that their NEPA and NFMA claims also demonstrate "violation of [the Forest Service's] Organic Act duties." Pls.' Br. 30. For the reasons described above, the agency has fully complied with NFMA and NEPA and thus this claim fails as well. Moreover, the Organic Act directs the Forest Service to "make such rules and regulations" as necessary to regulate the "occupancy and use" of the forests, and requires mining entrants to comply with those rules and regulations. 16 U.S.C. §§ 478, 551. Under this authority, and consistent with the agency's dual mandate to protect National Forests while allowing mineral development under federal mining law (*see supra* Legal Background Part I), the Forest Service promulgated the 36 C.F.R. Part 228A regulations. And here, the Record readily refutes any suggestion that the Forest Service has abrogated its regulatory direction to require mitigation measures for the Project that "where feasible, [] minimize adverse environmental impacts on

National Forest surface resources." *See* Pls.' Br. 29 (citing 36 C.F.R. § 228.8); AR001374-1405 (listing more than 100 required mitigation measures best management practices). The agency's detailed and extensive mitigation measures for minimizing impacts on National Forest surface resources easily surpass any obligations under the Organic Act and the Part 228A regulations.

## IV. PLAINTIFFS ARE NOT ENTITLED TO THEIR REQUESTED RELIEF

The Forest Service fully satisfied its obligations under NEPA, NFMA, and the Organic Act. Should the Court conclude otherwise, Federal Defendant respectfully requests the Court afford the Parties an opportunity to submit remedy briefing for the Court's consideration. Should the Court rule for Plaintiffs on the merits without further remedy briefing, the appropriate remedy would be to remand the decision and analysis at issue back to the agency without vacatur. Vacatur is not a mandatory remedy, and even if an analysis "falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more[.]" *Seven Cnty.*, 605 U.S. at 185; *see also Pac. Bell v. Pac. W. Telecomm. Inc.,* 325 F.3d 1114, 1122-23 (9th Cir. 2003). Vacatur is not warranted here given the narrow scope of Plaintiffs' claims. *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (whether vacatur is required depends on the seriousness of any errors and the disruptive consequences of interim change).

## CONCLUSION

The Court should grant summary judgment for Federal Defendant on all claims. Plaintiffs have not carried their burden of showing that the Forest Service's decision violated NFMA, NEPA, or the Organic Act. The agency has twice updated its analysis for this modest exploratory drilling project, resulting in a robust decision and analysis that fully satisfies all statutory requirements. The Court should reject Plaintiffs' claims and allow the Project to move forward.

Respectfully submitted this 20th day of March, 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

*/s/ Emma L. Hamilton*
EMMA L. HAMILTON (CA Bar No. 325360)
Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
Albuquerque, New Mexico 87102
(202) 305-5689
emma.hamilton@usdoj.gov

BART M. DAVIS
United States Attorney
District of Idaho

*Attorneys for Federal Defendant*